### Dexter A. Ballou v. Michael W. O'Brien, John L. Walsh and Daniel Burns.

*United States grants of land to the State : Indian reservations.* The grant of a sovereignty must have operation according to its intent; it may operate immediately, or from time to time, if such appear to be its purpose. The words employed in the proposition relating to school lands in the act of Congress for the admission of Michigan into the Union, ( *Comp. Laws, p. 33* ), indicate an intent on the part of the United States that the grant should have a continuous operation ; and, therefore, lands reserved for the benefit of Indian tribes by treaties with them,. prior to the admission of the State, will, on the extinguishment of the Indian title, be conclusively presumed, as against a trespasser, or one not claiming under the United States, to be embraced within the proposition granting lands to this State, contained in the act of admission.

*State lands : Reclamation of stolen timber.* Whether the Commissioner of the State Land Office, or the Governor, be the proper officer to appoint an agent to reclaim timber stolen from the State lands ; or whether the act of the Commissioner in appointing such an agent will not, in the absence of any showing to the contrary, be presumed to have been duly authorized by the Governor,—*quære :* —but, in an action for such timber, brought by a party deriving title by purchase from an agent appointed by the Commissioner, neither the trespasser nor any party claiming under him, will be allowed to question the validity of such appointment.

*Sales of reclaimed timber.* A private, rather than a public sale of timber reclaimed from trespassers on the State lands, is not of itself a ground of invalidity, where the case is free from secrecy and fraud.

*Replevin : Demand before suit.* The rule of this Court in *Trudo v. Anderson, 10 Mich., 357,*—that where one's property has been disposed of without authority by the person having it in charge, the owner may bring replevin therefor without previous demand,—cited and approved.

*Heard April 29. Decided May 3.*

Case made from Bay Circuit.

This was an action of replevin, brought in the Circuit Court for the County of Bay, by Dexter A. Ballou, against Michael W. O'Brien, John L. Walsh and Daniel Burns, for the recovery of the possession of a lot of pine logs, being about six hundred in number, which were then lying in Culver Creek, and in or near the Kawkawlin river, in Bay County, and were alleged to have been cut on the east half of the south-east quarter of section sixteen, township fourteen north, of range four east.

The defendants, O'Brien and Walsh, pleaded jointly, and the defendant Burns separately, the general issue.

On the trial of the cause, the plaintiff offered in evidence a power of attorney executed by Benjamin D. Pritchard, Commissioner of the Land Office of the State of Michigan, authorizing and empowering Edward L. Briggs, " as the agent of the State Land Office to enter upon any lands belonging to the State of Michigan, or on any lands for which the said State is acting as trustee, and seize and report the seizure of any timber, or property unlawfully cut upon any of the said lands, and to seize and report the seizure of any timber or lumber or shingles manufactured from any timber so unlawfully cut or taken from any of said lands, where the same shall be found within the limits of this state, and can be identified; * * * * and dispose of the same at public or private sale as he shall deem best."

It appeared in evidence, that the defendant, Burns, entered upon the lands described in the declaration, and cut the logs in question, and caused them to be hauled to the mouth of Culver Creek, where they were afterwards seized by Briggs; and that Briggs, acting as agent of the State

Land Office, in consideration of fifteen hundred dollars to him paid for the State, sold to the plaintiff all the right, title and interest of the State of Michigan in and to the logs and timber cut by Daniel Burns and others, &c.

It was also proved that the land upon which all of said logs were cut, and upon which they grew, was included in the forty thousand acres tract on the west side of the Saginaw river, in the County of Bay and State of Michigan, and was reserved to the Chippewa nation of Indians by the treaty made and concluded at Saginaw, in the Territory of Michigan, between the United States of America, by their Commissioner, Lewis Cass, and the Chippewa Nation of Indians, on September 24th, 1819. And that the said reservation of forty thousand acres was duly located according to said treaty in the year 1820; and the lands embraced in said reservation were surveyed and sub-divided by the Government of the United States, into townships, sections and quarter sections, in the usual manner, in the year 1843; and the lands in question are located and described according to the said Government survey. At the time of the execution and delivery of said bill of sale to plaintiff, all the logs in question were in the possession of the defendants, and plaintiff knew that fact; and said logs were not delivered to the plaintiff by said Briggs, or otherwise, and were never in the possession of the plaintiff. The plaintiff never demanded the logs of the defendants, or either of them, before the commencement of this suit, and before the seizure by said Briggs of said logs, all of said logs were sold and delivered to defendants O'Brien and Walsh by defendant Burns; and in making said purchase said O'Brien and Walsh acted in good faith.

The cause was tried by the Circuit Judge without a jury, and he was requested, on behalf of the defendants, to adopt the following propositions as the law of the case:

"1. That the Commissioner of lands had no power to sell the logs in controversy in this suit to the plaintiff, and

that the plaintiff acquired no title to said logs by the sale, or attempted sale made by Edward L. Briggs.

"2. That said Briggs had no legal authority to act for the State of Michigan, or for the Commissioner of lands, in selling the logs in controversy to the plaintiff, and the plaintiff by the bill of sale made by said Briggs acquired no title to said logs.

"3. That the State of Michigan was not, at the time of the cutting of the logs on the land described in plaintiff's declaration, the owner of said land.

"4. That at the time of the sale made by said Briggs to the plaintiff, the State of Michigan was not the owner of the logs in question, and could pass to the plaintiff no title to said logs.

"5. That, as at the time of said sale to said plaintiff, said logs were in the actual adverse possession of other parties, and not in the possession of the State, no title passed to the plaintiff.

"6. That the land described in said writ, at the time of the cutting of said logs, was the land of the United States, and not the land of the State of Michigan.

"7. That the Commissioner of the State Land Office had no lawful authority to delegate to said Briggs the power to sell the logs in question, and therefore the power of attorney executed by said Commissioner to said Briggs gave him no power to sell said logs to the plaintiff.

"8. That said Commissioner had no power to sell the timber of the State lands separate from the lands themselves.

"9. That the defendants having been in the peaceful possession of the logs at the time of executing the bill of sale to the plaintiff, the plaintiff cannot recover in this action without proof that a demand was made in his behalf of the defendants for said logs.

"10. That the plaintiff cannot recover in this action against said O'Brien and Walsh, without proof that a de-

mand was made in behalf of the plaintiff for said logs after his purchase from the State.

"11. That the logs, if they were the property of the State, had been converted by the defendants before the purchase by the plaintiff, and the plaintiff acquired no lawful right to recover the value of the logs from the defendants.

"12. That the said power of attorney is void for the reason that it is contrary to public policy, and the statutes and policy of this State.

"13. That the act of 1836, granting sections sixteen to the State, is not of itself sufficient evidence that the State acquired the title to the land on which said logs were cut."

All of which he refused, and found the plaintiff entitled to recover the value of the logs, at the sum of $1,601.08. To each of which findings and conclusions of law the defendants excepted.

A judgment was rendered in the usual form for the plaintiff; which is brought into this Court for review upon case made.

*Marston & Hatch,* for plaintiff.

The most important questions in this case are:

*First,*—Was the State of Michigan "at the time of the cutting of the logs on the land described in plaintiff's declaration the owner of said land?" and—

*Secondly,*—Did the Commissioner of the State Land Office have the authority to delegate to Edward L. Briggs the power to seize and sell the logs in question to the plaintiff?

I. The State of Michigan was owner of the land at the time the logs were cut, by virtue of the first subdivision of section one of "An ordinance relative to certain propositions made by the Congress of the United States to the Legislature of the State of Michigan," approved July 25th, 1836.—*1 Comp. Laws p. 37.*—This grant was accepted by

the State, December 15th, 1836.—*Id. pp. 41-2.*—This provision, when thus accepted, operated as a grant or conveyance to the State of section sixteen in every township, not sold or otherwise disposed of, and it was not necessary that a patent should be issued by the United States to the State in order to give effect to the grant.—*Stockton v. Williams, 1 Doug., 547 ; Godfrey v. Beardsley, 2 McLean, 412 ; Gains v. Nicholson, 9 How., 361 ; Cooper v. Roberts, 18 How., 173; Maiden v. Ingersoll, 6 Mich., 373.*—The lands upon which the logs in question were cut were surveyed and sub-divided by the Government of the United States, in the usual manner in the year 1843.

It may, however, be claimed by the defense, that the section upon which the logs in question were cut, was at the time of the grant in 1836, "disposed of" by virtue of the treaty between the United States and the Chippewa Nation of Indians, made September 24th, 1819, and therefore did not pass to the State under that grant.—*7 U. S., Stat., at large, 203.*—This treaty gave the Indians no greater right to the territory thus reserved than they had before. If this reservation is in the nature of a grant then it is to receive a strict construction, and nothing would pass under it by implication.—*La P. B. H. Co. v. Monroe, Walker's Ch., 155.*

The fee of all the unsold land in the United States is either in the United States or in the States within which such lands are situated. The Indian title, or that interest which originally belonged to the native tribes, was one of use or occupation only.—*3 Washburn on R. Pr., 168 ; Doe v. Beardsley. 2 McLean, 412 ; Stockton v. Williams, 1 Doug., 546 ; Johnson v. McIntosh, 8 Wheat., 543 ; Mitchell v. United States, 9 Peters, 711.*—And the United States, as owner of the fee, may grant that, subject to such occupancy, but no possession can be taken until such right of occupancy is extinguished.—*3 Wash., 168, Doe v. Beardsley ; Fletcher v. Peck, 6 Cranch, 87.*

The treaty of January 14th, 1837, *7 U. S. Stat., 528,* in which the Saginaw tribe of the Chippewas cede this forty thousand acre tract to the United States, cannot affect the rights, or title already acquired by, and vested in the State of Michigan, even if the general language used in the third article of that treaty should be construed as a positive agreement on the part of the United States to sell all sections numbered sixteen included therein. This treaty was not ratified until after the grant to the State. A patent for lands already granted by treaty or otherwise is void, and so of a subsequent grant of Congress, if already granted.—*3 Wash., 174, 180; Stoddard v. Chambers, 2 How, 284; Hunter v. Hemphill, 6 Mo., 106; Stockton v. Williams, 1 Doug.; Fletcher v. Peck, 6 Cranch 87 ; Mayor v. De Armas, 9 Pet., 223 ; Zerrott v. Taylor, 9 Crauch, 43.*—The Government cannot resume its grant. A grant is a contract executed, and it is a principle applicable to every grant that it cannot affect pre-existing titles.—*Mayor v. De Armas* and *Zerrott v. Taylor ; Minnesota Mining Co., v. the National Mining Co., 11 Mich., 187.*

The case does not show that the United States, either sold, or in any way interfered with the rights of the State to the lands upon which the logs in question were cut ; the presumption is that the United States did not. If, however, any question could arise under the 3d article of the treaty of January 14, 1837, yet, the United States not having sold the lands in question under that treaty ; and the specific section upon which the logs were cut having ·been designated by survey in 1843 ; and the Chippewas, in article three of the treaty of August 2, 1855, *U. S. Stat., 34 Cong. p. 31 of Treaties,* having ceded to the United States, "all the lands within the State of Michigan heretofore owned by them as reservations, and whether held for them in trust by the United States or otherwise," all legal impediments to the operation of the act of 1836 were thereby removed. The title of the State became perfect and disencumbered,

whatever might have been its pre-existing state.—*Cooper v. Roberts, 18 How., 173; Minn. Mining Co., v. Nat. Mining Co., 11 Mich., 193.*

II. Let us now examine the second question.

We admit the general rule, " that one who has a bare power or authority from another to do an act, must execute it himself, and cannot delegate his authority to another." But this rule, we insist, does not apply to cases like the present. Where a public officer, from the nature of the business entrusted to his care, must necessarily employ agents to assist him, he has an implied power to employ them. Such power is indispensable in order to accomplish the end for which the department was created, and from the very necessities of the case, the law gives him that power.—*Story on Agency,* § *14; U. S. v. McDaniel, 7 Pet., 1; U. S. v. Ripley. Id., 18 ; U. S. v. Fillebrown, Id., 28 ; Gratiot v. U. S., 15 Id., 336.* This question we consider fully settled by the decision of this Court in the case of *Stevenson v. Little, 10 Mich., 433.*

III. The right of the State to sell the logs, although in possession of defendants at the time, must be considered as settled by the decision of this Court in the case of *Final v. Backus, 18 Mich., 218.*

IV. Plaintiff can maintain replevin to recover the property without a previous demand. *Trudo v. Anderson, 10 Mich., 357.*

*Theo. C. Grier,* for defendants O'Brien and Walsh.

1. Did the State ever acquire the title to the land in question ?

It is claimed on the part of the defendants that the land in question did not pass to the State, for the evident reason, that by the treaty it had been "otherwise disposed of." Its condition, application and employment were *fixed.* The Government *exercised the power of control over it* and assigned it *for the use* of the Chippewas.

And the term "otherwise disposed of" in the statute was clearly used to refer to some disposition of the lands other than an absolute sale. The language of the statute is "and when such section has been sold or *otherwise* disposed of," &c. It is evident that it was the intention of Congress to grant no lands that had been set aside or reserved for any purpose, and hence the broad term "otherwise disposed of."

Whenever a tract of land shall have once been legally *appropriated to any purpose*, from that moment the land thus appropriated becomes severed from the mass of the public lands, and no subsequent law, or proclamation, or sale, would be construed to embrace it, or to operate upon it, although no reservation were made of it. — *Wilcox v. Jackson, 13 Peters, 498; Spaulding v. Martin, 11 Wis., 275; Turner v. Am. Baptist Union, 5 McLean, 344; Vincennes University v. Ind., 14 How., 268; U. S. v. Stone, 2 Wall., 525.* —A stipulation in an Indian treaty that a quarter section of land shall be *reserved and sold*, and the *proceeds of the sale paid* to those entitled to them, is such a withdrawal of the land from general appropriation.—*Turner v. Am. Bap. Un., 5 McLean, 344.*—And a patent issued while such reservation is in force does not become valid by reason of the bar of the reservation being subsequently removed.—*Easton v. Salisbury, 21 How., 426.*—The reservation of the land to the Indians placed it beyond the power of any officer of the United States.—*Ladiga v. Roland, 2 How., 581.*

But it seems to have been regarded on the part of the plaintiff as a complete answer to this conclusion to say that the reservation to the Indians, in the treaty of 1819, gave them no greater right to the territory reserved than they had before.

But if this were established law, how does it, in any manner, controvert or affect our position? The reservation involved in the case of *Spaulding v. Martin* was a reservation to the government for military purposes, and it was held not to be included in the grant to the State.

The object to be aimed at in construing this act of Congress, as in all others, is the *intent* of Congress.—*Spaulding v. Martin, 11 Wis., 273.*—And, as has been shown, the test that is applied in construing such general grants is this:—Can it be supposed that Congress meant to grant lands that the government had set aside for a particular purpose? And the courts have invariably answered in the negative.

It is immaterial whether the treaty changed the title of the Indians in the land reserved or not. But the treaty at least increased the guarantees or assurances of their title to the land reserved. Whatever may have before been the actual condition of their right in the land, there was, after the treaty, no longer any doubt as to their title.

The Indian title before the treaty was an absolute right to the possessions of the lands, and as that was a right that could not be divested, except by the consent of the Indians, it was a right that was in its nature perpetual or liable to be perpetual. It was a right that until *legitimately* extinguished, the courts were bound to respect.—*Fletcher v. Peck, 6 Cranch, 89 ; 2 Wash. R. P., 521 ; Gillespie v. Cunningham, 2 Humph. 19.* The right of the Government in Indian lands "amounts only to the *exclusive* right of purchasing such lands as the natives are *willing to sell."*—*Cherokee Nation v. Georgia, 5 Pet., 1 ; Worcester v. Georgia 6 Pet., 515 ; 3 Kent's Com., 382.*

It follows, therefore, that the treaty of 1819 operated as a compact that the Chippewas should at least have and enjoy the perpetual use of the lands reserved. Whether they acquired a greater right than this is not material in this case. At least the obligation which the Government incurred by this treaty was *paramount* to that arising from its grant to the State.—*Cooper v. Roberts, 18 How., 178.*

If the position taken by us were not entirely clear by the express terms of the treaty of 1819, and the grant of 1836 to the State, it would seem that the subsequent treaties

between the Government and the Chippewas would put the question beyond all shadow of doubt.

These treaties remained in full force and in no way modified until the treaty of August 2d, 1855. These successive treaties relate to the same object, they are to be taken *in pari materia* and construed together as one act, the whole forming one body of law from which the *purpose* of the grant is to be adduced.—*State v. Springfield, 6 Ind., 83.*

The Government proceeded in every step of its dealings with the Indians in regard to these lands upon the clear presumption, that the title of the lands was vested in the Indians. The whole legislation of Congress, and the entire practice of the Government, clearly show that it was never contemplated that any lands included in these reservations were granted to the State.

2. Has the Commissioner of the State Land Office any power or lawful authority to sell timber that has been severed from the land of the State?

By the Constitution, the Commissioner of the Land Office " shall perform such duties as may be prescribed by law."—*1 Comp. Laws, 63.* By law, the Commissioner shall have the general supervision of all LANDS belonging to the State, and may " *superintend,* lease, sell and dispose of the same in SUCH MANNER AS SHALL BE DIRECTED BY LAW."— *C. L. 772.*

And the statute gives no authority to him to sell timber, and no such authority is " directed by law." But the Statute does enumerate the duties of his office. *Expressio unius est exclusio alterius:* and this maxim is peculiarly applicable to statutes.—*Broom's Legal Maxims, 421 ; State v. Hastings, 10 Wis., 53.*

The statute, by enumerating the powers of the Commissioner, impliedly limits his authority to such cases, and he possesses no power not expressly conferred on him.—*Holt v. Bacon, 30 Conn., 21 ; Van Dyke v. State, 24 Ala., 81 ; U. S.*

*v. Hudson, 3 McLean, 156 ; State v. Hastings, 10 Wis., 518 ; Hopple v. Brown, 13 Ohio, 311.*

And we insist that if there was any power to sell timber separate from the land, it is a power reposed only in the Governor. The executive power of the State is reposed in him. And he is the only officer that can pass the title to these school lands. By law, he is to issue the patents, and the fee remains in the State until such patents shall issue.—*C. L. 780 ; Ib. 56.*

3. Can the Commissioner of lands delegate any such authority ?

It is a general principle of law, and one strictly adhered to in the case of public officers, that a person authorized to do that which requires the exercise of discretion, or which involves the elements of personal trust and responsibility, cannot delegate such powers to another. *Delegatus non potest delegare.—Broom's Legal Maxims, 666 ; Lynn v. Burgoyn, 13 B. Monroe, 400 ; State v. Hastings, 10 Wis., 518; State v. Smith, 1 Oregon, 250 ; Greene et al., v. The State, 8 Ham. (Ohio) 310 ; Butterfield v. Inhabitants of Melrose, 6 Allen 187.*

And the authority to sell at *private sale* would be a dangerous one to repose in the Commissioner himself. All public officers are agents, and their official powers are fiduciary. They are trusted with public functions for the good of the public. And a greater necessity exists than in private life for removing from them every inducement to abuse the trust reposed in them.—*People v. Town Board, 11 Mich., 222.*

Delegated powers must be strictly pursued, and the execution of a power to sell or dispose of lands by public officers must be in strict pursuance of law, or no title is conveyed.—*Osborne v. Tunis., 1 Dutch. (N. J.) 633.*

In New York it was held that the Commissary General could not delegate any discretionary power to the keeper of the Arsenal, and the same doctrine has been held in numer-

ous cases.—*State v. Buffalo, 2 Hill, 438; 1 Pars. on Cont., 83; Trustees v. Otis, 37 Barb., 50 ; Zottman v. San Francisco, 20 Cal., 96 ; Bocock v. Pavery, 8 Ohio, (N. S.,) 270 ; Butler v. Charlestown, 7 Gray, 12 ; People v. Talmadge, 6 Cal., 256 ; White v. Davidson, 8 Md., 169 ; Sloughton v. Baker, 4 Mass., 522 ; Tippetts v. Walker, 4 Mass., 595 ; Brewster v. Hobart, 15 Pick., 307 ; Welsh v. Parish, 1 Hill, (S. C.,) 155 ; Com. Bank v. Norton, 1 Hill, 501; Mason v. Joseph, 1 Smith, (Eng.,) 406.*

4. We contend that from the fact that the property was in the adverse possession of the defendants at the time of the sale to the plaintiff, and from the additional fact that he never made a demand for the property before bringing this action, it cannot be maintained. Replevin will not lie for property held adversely to the plaintiff at the time of the sale.—*O'Keefe v. Kellogg, 15 Ill., 347 ; McCandish v. Newman, 22 Penn., 460 ; Dillon v. Wright, 7 J. J. Marsh, 10 ; Stedman v. Reddick, 9 Hawks, 29 ; Stogdell v. Fugate, 2 Marsh. 136 ; Oliver v. Walsh, 6 Cal., 456 ; Gardner v. Adams, 12 Wend., 297 ; Com. v. Fugua, 3 Litt., 41.* The purchaser of property tortiously in the hands of a third person at the time of the purchase, must first demand the property before he can reclaim it or maintain an action for it.—*Gardner v. Adams, 12 Wend., 298 ; 2 Comstock, 293 ; Cortland v. Morrison, 32 Maine, 190 ; Hicks v. Cleveland, 39 Barb., 573.* The owner of land cannot bring replevin for chattels severed from the land in the adverse possession of another.—*Anderson v. Hopler, 34 Ill., 436 ; Rogers v. Fowler, 28 Cal., 605.* The owner of chattels cannot maintain his suit in replevin to recover them from a purchaser in good faith from a wrongful taker, until after a demand.—*Connor v. Comstock, 17 Ind., 90 ; Millspaugh v. Mitchell, 8 Barb., 333.*

COOLEY, J.

The principal question involved in this case concerns the right of the State to the sixteenth section of land in

the several townships embraced within the reservation of forty thousand acres, made to the Chippewa Indians, by the Treaty of Saginaw of 1819.

By the treaty in question the Chippewa nation ceded to the United States a very large extent of territory, but reserving, nevertheless, therefrom, fifteen different tracts of land which were specified, and also one tract of forty thousand acres on the west side of the Saginaw river, to be thereafter located.—*7 Stat., at large, 203.*—This tract was actually located in the year 1820.

By the treaty of Detroit of 1837, these several reservations, (excepting one small one), containing in all one hundred and two thousand four hundred acres, more or less, were ceded by the Chippewa nation to the United States; the United States at the same time agreeing "to pay to the said Indians in consideration of the lands above ceded, the net proceeds of the sales thereof, after deducting the expense of survey and sale," together with the incidental expenses of the treaty. The lands were to be surveyed in the usual way, and offered for sale in the same manner as other public lands.—*7 Stat., at large, 528.*—They were actually surveyed in the year 1843, and put upon the market.

This treaty remained in force until the treaty of August 2, 1855, by which the Chippewas ceded to the United States "all the lands within the State of Michigan, heretofore owned by them, as reservations, and whether held in trust for them by the United States or otherwise," and agreed to accept in satisfaction of all claims, legal and equitable, on the part of said Indians against the United States, for lands, money or other thing guaranteed to them, certain grants and payments which the treaty last mentioned provided for.

The State of Michigan was admitted to the Union on the acceptance of certain propositions made by the act of Congress of June 23, 1836, under one of which, the proper State officers have assumed that the land in question be-

came the property of the State. The act of Congress and the acceptance thereof are published with the *Compiled Laws* *p. 37.*

In the winter of 1866–7 it appears that one Daniel Burns went upon section sixteen, in township fourteen north, of range four east, which was within the limits of the forty thousand acre reservation, and cut a quantity of pine logs. It does not appear that the land upon which the logs were cut had ever been patented or sold by the United States to an individual purchaser, or pre-empted, or allowed to be taken as a homestead. In February, 1867, the Commissioner of the State Land Office appointed one Edward L. Briggs " as agent of the State Land Office, to enter upon any lands belonging to the State of Michigan, or on any lands for which the State is acting as trustee, and seize and report the seizure of any timber or property unlawfully cut upon any of said lands, and to seize and report the seizure of any timber or lumber or shingles manufactured from any timber so unlawfully cut or taken from any of said lands, where the same shall be found within the limits of this State, and can be identified;" and, by the power of attorney given him by the Commissioner, it was made his duty immediately to report the land upon which a trespass had been committed, the quantity of timber cut upon the same, and its probable value, and to dispose of the same at public or private sale, as he should deem best, and also to settle and adjust all trespasses, reporting in each case the amount secured by the settlement. Acting under this power of attorney, the agent seized upon the logs so cut by Burns, and sold them, at private sale, to the plaintiff for the sum of fifteen hundred dollars, which was paid to him by the plaintiff, and was nearly or quite the full cash value of the logs. Burns, however, had previously sold the logs to the defendants, O'Brien and Walsh, who bought in good faith, and this suit was an action of replevin therefor, and was brought without any previous demand.

The defendants insist:

1st.   That the land upon which ;the trespass was committed was not the property of the State of Michigan as primary school lands, but was the property of the United States.

2d.   That, conceding the lands to belong to the State, the Commissioner of the State Land Office had no authority to appoint an agent with the powers he attempted to confer upon Briggs, and consequently the seizure and sale of the logs were void, and the plaintiff acquired no title thereto.

3d.   That, even if the sale of the logs to the plaintiff was valid, he could not lawfully replevy the same without first making demand therefor.

The first proposition is a somewhat startling one, inasmuch as it applies to all the supposed primary school lands lying within such Indian reservations as have been lifted since the admission of the State to the Union, all of which, it is now claimed, have never become the property of the State, but are subject to entry and sale at the public land offices of the United States, and to pre-emption claims, like other public lands.

Had this question been made by the Commissioner of the General Land Office, or by the law officers of the United States, we should regard it as requiring at our hands a more serious and extended discussion than now appears essential; but it is not suggested, nor have we even heard that the claim which three private citizens, in a controversy exclusively their own, now make on behalf of the Government, as a means of self protection from the consequences of a criminal trespass, has ever been advanced by any person acting with authority, or that the Federal Government has the slightest disposition to contest or question the title which the State has assumed to possess.

It does not occur to us, however, when we regard the legislation of Congress bearing on the subject, and the uni-

form policy of the United States in the endowment of the public schools, that there would be much plausibility in any adverse claim that could now be set up against the State. The objection is based upon the first proposition made to Michigan by the United States, by the act of June 23, 1836, and which proposed "that section numbered sixteen in every township of the public lands, *and where such section has been sold or otherwise disposed of*, other lands equivalent thereto, and as contiguous as may be, shall be granted to the State, for the use of schools." The argument is, that all the lands, which by the treaty of Saginaw were reserved to the Indians, were thereby "disposed of," so that the grant made to the State in 1836 could not possibly convey them; and it is further argued that the subsequent treaties, which being in *pari materia*, must be considered with the act of 1836, in order to arrive at its true interpretation, all tend to show that the United States have not regarded any portion of the lands, lying within those reservations, as falling within the proposition of the act of 1836 above quoted.

It is quite clear that the lands in question did not pass from the United States by the mere act of the State in accepting the propositions made to it by the act of Congress referred to. The lands at that time were reserved to the Indians, and it was not certain that the Indian title thereto would ever be extinguished. The Federal Government was under no obligation to the State to extinguish it, and although, looking at the general policy of the Government, it was highly probable that this would be done, yet the period of any attempt in that direction was wholly uncertain; and when it came to be made it was quite possible that such conditions might be insisted upon by the Indians as would preclude the State acquiring any claim.

The case actually shows that such conditions were insisted upon, and also that they were submitted to by the

Government. The treaty of 1837 transferred the Indian title to the United States, but in trust only; and the Government undertook to sell the lands and account to the Indians for the proceeds. This treaty appears to have applied to the sixteenth section as much as to any others. It is very clear, we think, that while this treaty remained in force, the State acquired no right to the several sections sixteen which were surveyed under it. But this treaty was superseded by that of 1855, by which the trust interest of the Indians was forever extinguished, and the lands embraced by the reservations became a part of the general public domain.

Now there has been a uniform policy on the part of the general government, that every sixteenth section of the whole public domain should pass to the State, in which it was situated, for the use of schools. Wherever, by reason of previous grant or other disposition this has become impracticable, other lands contiguous thereto are substituted. Those lands, however, in which the Indians have a possessory title, do not fall within the influence of this policy until that title is extinguished; but, as soon as the extinguishment takes place, the policy attaches. Until 1855, therefore, the State neither acquired a right to the lands in question, nor did the proposition of 1836 we have cited oblige the general government to convey other lands in lieu thereof. But there can be no serious question, we think, that the right passed to the State in 1855, unless there is something in the terms of the proposition of 1836, which would confine its operation to lands which were in such condition, in regard to title, that they might pass immediately when the proposition was accepted.

The grant by an individual must generally operate at once, if it ever does; but the grant of a sovereignty is governed by different principles, and must have operation according to its intent, whatever that may be. It may have a continuous operation, so as to transfer different parcels of

20 MICH.—O².

land, from time to time, as the sovereignty may become vested with title thereto, if such appear to be its purpose. And such we think was clearly the purpose of the proposition of 1836. Its design was that every section numbered sixteen of the public domain, whether then constituting a part thereof, or becoming such afterwards by extinguishment of the Indian title, should be granted to the State as an educational fund. The words employed in the proposition aptly indicate an intent that it should have continuous operation, and we have seen already that the general policy of the government was in accord with this apparent purpose. We have therefore no difficulty with the first question.

The second is perhaps more doubtful. By the Constitution there is to be a Commissioner of the Land Office, who is to perform such duties as may be prescribed by law.— *Art. 8 § 1.*—The title of the office would indicate a general purpose that he should have charge of the State lands, and the legislation of the State carries out this general purpose. Nevertheless there is no statute which empowers him to seize and sell timber cut by trespassers, or to appoint agents for that purpose. And if it is proper and legal to appoint agents at all for such a purpose, there may be room for doubt, whether the appointment should not come from the Governor, rather than the Commissioner.

That the proper officer to look after the public lands and protect them against trespassers may exercise his authority through subordinate agents, we do not doubt. To render his authority effectual, it is or may be absolutely essential that he should be at liberty to delegate it. Neither the Governor, nor the Commissioner, can be expected to visit in person every scene of depredations, and decide upon his own judgment what disposition should be made of such stolen timber as can be reclaimed. The power to appoint agents for the purpose, and which the defense insists is a dangerous one, appears to us more dangerous to the tres-

passers than to the State; for without it, they might calculate upon escape with reasonable certainty in the majority of cases. We say nothing of the very broad powers which the Commissioner attempted to confer upon his agent in the present case, but looking only at what was done here—the seizure and sale,—and we are of opinion that if the Commissioner was the proper officer to make an appointment, the power in this instance was lawfully conferred, and the record indicates that it was very properly exercised.

And, whether the appointment should emanate from the Governor or the Commissioner we do not feel called upon, in the case before us, to decide. We do not understand that the Governor, or any proper State authority questions the validity of the agent's acts. The State has been paid for the timber, and does not repudiate the transaction. If the Commissioner were a mere executive agent of the Governor,—as the proper land officers of the United States are of the President,—we should have no doubt that his act should be regarded as the act of his executive superior. See *Stephenson v. Little, 10 Mich., 440.*—And although he is an independent constitutional officer, acting in a sphere of his own, we think we may well infer, in a matter pertaining to the public lands, where, if the Governor has authority, it would be very proper to exercise it through or by the assistance of this officer, that he has done so here, and given his assent to what has taken place. We think this a very proper inference to make on behalf of correctness of action, in a co-ordinate department of the Government. But this opinion is not to be understood as intimating that the Commissioner in this case was guilty of usurpation of authority.

It was suggested that it was an abuse of authority to authorize the agent to sell at private sale. We have already said that a fair price appears to have been obtained for the property in the present case, and we cannot say, as matter

of law, that a public, would always be better for the State than a private sale. As property seized by trespassers must frequently be sold in unsettled regions, where a concourse of bidders would be impossible, it might often be found that a sale at auction would sacrifice the property, while a private sale might easily be effected at fair prices. But we content ourselves here with saying that the fact of private sale is not of itself a ground of invalidity, where the case is free from secrecy and fraud.

The third objection made by the defense,—that the property could not be replevied without previous demand,—we consider settled against the defense by *Trudo v. Anderson, 10 Mich., 357*.

The judgment for the plaintiff is affirmed with costs.

CHRISTIANCY and GRAVES, JJ. concurred.

CAMPBELL, CH. J.

I think that under the decision in *Cooper v. Roberts*, the title of the State would have vested in section sixteen if the Indian title had been extinguished in the ordinary way, and a survey had been completed so as to designate the location. The grant, which until then was ambulatory, would have attached and made the transfer complete.

But if the grant did not attach when the land was designated, then there is no principle which can make it attach afterwards, except by way of estoppel. It could not mark any subsequent purchase by the grantor in any other way, and nothing but a plain and absolute warranty could make a later title enure to satisfy it. No such warranty was ever given. The act admitting Michigan into the Union did not declare that the State should have section sixteen at all events, but only in case it was not otherwise disposed of,—which disposition, if existing before the grant could take effect on any particular section, would defeat the State

title, and leave the deficiency to be made up by equivalent lands, as provided for by the statute.

In this case the treaty which extinguished the Indian title in the reserve, expressly appropriated these lands to a use inconsistent with any interest in the State. It cannot be questioned that a treaty is the supreme law, and superseded any conflicting claims. The land was put into the hands of the Government upon a definite trust, by the treaty of 1837, and when the survey was made, it was required to carry out that trust. The Government, as a trustee, could not lawfully have conveyed this section to the State, if it had been demanded; and the title was as distinct from a proprietary interest, as if the trustee had been a citizen instead of a nation. The trust was hostile and paramount to any State claim, and the land was effectually "disposed of," within the meaning of the act of admission. Had the government performed its pledged promise, the land would have been sold many years ago.

In a subsequent settlement with the Indians in 1855, the United States Government, for a new consideration, purchased whatever interest they had left under the trust, and thus acquired title in its own right. This is not the title to which the original reservation was to attach, and I think it would require a new arrangement to give the State any interest in these lands. If lands which have been once disposed of, vest in the State whenever the United States happen to repurchase them, the result will be very different from anything contemplated, when the enabling act containing the appropriation was passed. It never was supposed that section sixteen was likely to be better than any other, and the State being entitled to the same quantity, there is no reason why the grant should be extended beyond its plain terms.

I think the judgment erroneous on this ground. I express no opinion on the other questions.