## Abner C. Johnson v. Dexter A. Ballou.

*Land grant: Title: Grant in presenti.* The land grant for building a railroad "from Amboy by Hillsdale and Lansing to some point on or near Traverse Bay" (See 11 U. S. Stat. at Large, Little & Brown's ed., 21) is construed to be a present grant of the lands included within its terms to the state, to take effect on their selection when earned, and to have divested the United States of all title.

*Opinions of attorney general: Land grants.* The opinions of the attorney general on such a question, where they have been accepted and acted upon by the department of the interior, are worthy of high consideration; and they have been uniform in construing such grants as grants *in presenti.*

*Land grant: Treaty cessions: Individual bargaining: Common-law estates.* Such a grant, which partakes more of the nature of treaty cessions than of individual bargaining, will not be subjected to the definitions and refinements applicable to grants and conveyances from man to man; and it is unnecessary that it should be capable of being brought within any of the definitions given to estates at common law.

*Land grant: Floating title: Specific parcels.* The title which passed to the state by this grant was a floating title, not attaching to any particular parcels until the proper action should be had under the grant to entitle some intended beneficiary to select and own them.

*Rights of selection: Sales.* The right of selection of lands after they were earned under this grant, and the state legislation in reference to it, was with the railroad company and not the state; and no designation under the authority of the state was necessary to fix the floating title and attach it to specific descriptions; and as no legislation required any particular form or method of selection, when the proper quantity of public land was found within the requisite distance of the road, a sale by the company of specific parcels not exceeding the quantity earned, and lying within the limits specified in the grant, is held to be to that extent an effectual selection.

*Vested rights.* The arrangement between the Amboy, Lansing & Traverse Bay Railroad Company and the Jackson, Lansing & Saginaw Railroad Company, and the legislation following the same, by which the beneficial interest of the former in the land grant was transferred to the latter, could not operate to affect rights previously acquired by third parties.

*Construction: Inferences: Technicalities: Equities.* All reasonable inferences of construction should be against a position which rests not on equities, but on mere technicalities.

*Land grant: Application to purchase: Timber: Trespassers.* The effect of this land grant, and the location of the line of the road, was to take out of the body of the lands subject to sale by the United States, the sections of land covered by the floating grant; and an application to purchase them would give no right to go upon them or to cut the timber.

---

*Judge Christiancy was absent during most of this term on account of sickness in his family.

JOHNSON *v.* BALLOU.

Whether the land officers of the United States were still charged with the duty of protecting these lands against trespassers or not, they would have no authority as against the railroad company to sell off the timber from these lands, and thus deprive the company of a portion of the benefit intended by the grant.

*Evidence: Patent: Recitals.* The recitals in a patent are received as evidence of the time when the lands described in it were earned under this grant.

*Patent: Relation.* The patent for lands embraced in this grant is held, as against trespassers, to relate back at least to the time when the lands were earned.

*Practice: Writ of error: Final judgment.* In an action of trover for timber cut on two different sections, where the title of the respective sections is involved in such a way as to make a case of two distinct heads, although the jury, in answer to special questions, have found the value of the logs cut on the respective sections, the supreme court having on writ of error reversed the judgment for error on one branch of the case, and holding there was no error on the other branch, nevertheless decline to enter final judgment as to those logs embraced in the latter branch, where it did not appear how the jury made up the amount of their verdict, what they included or what they rejected.

*Heard July 9.      Decided January 7.*

Error to Bay Circuit.

This was an action of trover brought by Johnson against Ballou for certain pine saw-logs. The logs in question were cut partly on section one, in town fourteen north, of range three east, and partly on section seventeen, in town fourteen north, of range four east. The questions raised relate to the title to these sections. The cause was tried by a jury, who found a general verdict for the plaintiff, assessing his damages at two thousand two hundred and sixty-nine dollars. And they also found, in answer to certain specific questions propounded by the plaintiff, as follows:

"*First.* That Thomas Saylor, acting as timber agent of the United States, did on the 28th day of May, 1869, assume to sell to Burns the logs cut by him upon the east half of the southeast quarter of section one, town fourteen north, of range three east, and that the logs there cut by Burns and sold plaintiff on such parcel amounted to eight hundred and sixty-one thousand six hundred and seventy-three feet, and that the same were converted by the defendant without the plaintiff's consent, and that their value at

the time of conversion was nine thousand four hundred and seventy-eight dollars and forty cents.

"*Second.* That prior to the 28th day of May, 1869, it had been and was at that date the practice of the register and receiver of the United States land office, at East Saginaw, to act as timber agents of the United States in the seizure and sale of logs cut by tresspassers on the public lands.

"*Third.* That one hundred and fifty-two thousand four hundred and seventy-seven feet of logs were cut by Burns, upon the east half of the southeast quarter of section seventeen, town fourteen north, of range four east, which were converted by the defendant to his own use, and that the value of such logs at the time of conversion, May 28th, 1869, was nine hundred and fourteen dollars and eighty-six cents."

Judgment was entered upon the general verdict for the plaintiff, and he brought error.

*Winsor Scofield, Marston & Hatch, William L. Webber,* and *Ashley Pond,* for plaintiff in error.

*McDonell & Cobb,* and *G. V. N. Lothrop,* for defendant in error.

COOLEY, J.

The most important questions in this case relate to the title to the lands on section one, in township fourteen north, of range three east, and on section seventeen, in township fourteen north, of range four east. Should our conclusions be with the plaintiff on this branch of the case, the further questions may become unimportant, but if we disagree with his views regarding the title, it may become necessary, at least so far as the logs cut on section seventeen are concerned, to consider the further grounds on which he bases his claim.

It is conceded that the title to the lands was in the United States in 1856. On the third day of June of that year an act of congress was passed which provided that "there be and hereby is granted to the state of Michigan, to aid in the construction of railroads" from and to certain points therein specified, and among others from Amboy by Hillsdale and Lansing to some point on or near Traverse Bay, "every alternate section of land, designated by odd numbers, for six sections in width on each side of each of said roads," with the exception of lands previously sold or pre-empted, in place of which others might be selected and located to make up the proper quantity: "*Provided*, That the lands to be so located shall in no case be further than fifteen miles from the lines of said roads, and selected for and on account of each of said roads."

The third section declared: "that the said lands hereby granted to the said state shall be subject to the disposal of the legislature thereof for the purposes aforesaid, and no other." And the fourth: "that the lands hereby granted to said state shall be disposed of by said state only in manner following, that is to say: that a quantity of land not exceeding one hundred and twenty sections for each of said roads, and included within a continuous length of twenty miles of each of said roads, may be sold, and when the governor of said state shall certify to the secretary of the interior that any twenty continuous miles of any of said roads is completed, then another quantity of land hereby granted, not exceeding one hundred and twenty sections of each of said roads having twenty continuous miles completed as aforesaid, and included within a continuous length of twenty miles of each of such roads may be sold; and so from time to time, until said roads are completed; and if any of said roads is not completed within ten years, no further sales shall be made; and the lands unsold shall revert to the United States."—*11 U. S. Stat. at large, Little and Brown's ed., 21.*

JOHNSON *v.* BALLOU.

It becomes of importance to the parties to determine whether this act of congress constituted a present grant of the lands included within its terms, to take effect on their selection when earned, or whether on the other hand it conferred upon the state of Michigan merely a power, which, when it came to be exercised in behalf of the intended beneficiaries, would require further action, either by way of the issue of a patent or of some equivalent act, to perfect in the beneficiary a title to the land earned. The plaintiff insists that the title passed to the state, while the defendant disputes this, and claims that the title never passed from the United States, until the lands earned were patented to the Jackson, Lansing & Saginaw Railroad company, as hereinafter stated.

It will be observed that the phraseology of the act of 1856 imports a conveyance to the state, and not the creation of a power merely. The words are "that there be and is hereby granted," etc. And further on the lands *granted* are repeatedly spoken of, and it is provided when and on what contingency they shall revert to the United States. While this phraseology would not be conclusive if from other portions of the act it plainly appeared that the purpose was only to confer a power; yet it must be confessed that one who insists that an act of the government which employs the operative words of present conveyance, with provision of forfeiture on breach of condition, was intended to confer an authority only, is called upon to point out where and in what words the intent he insists upon is found expressed.

The defendant relies upon the manifest purpose of the act to give to the state a power in trust only; a purpose which he thinks is apparent in all its provisions, and which was found in a similar act by the federal supreme court in *Rice v. Railroad Co., 1 Black, 377.*

The case in Black differs from the one before the court, in the important particular that the act there under discussion expressly provided that no title should vest in the ter-

ritory of Minnesota, the grantee therein named, until the condition of the act had been complied with. That explicit declaration would seem to remove from the case all ambiguity and all question; and though it is true the learned judge who delivered the opinion in that case employs in some parts of it language sufficiently general, if considered by itself and without the context, to support the views of the defense, yet we cannot discover that the negative declaration we have referred to was at any time absent from his mind as a controlling feature of the case, nor can we satisfy ourselves that the conclusion would have been the same if that declaration had been wanting.

On the other hand, the opinion in the office of the attorney general has been uniform that an act of the nature of the one under consideration is a grant *in presenti.* This was the advice of attorney general Cushing to the secretary of the interior under an act almost precisely identical with this (*8 Op. of Att'y Gen'l, 244*), and this advice was afterward reiterated by his successor, Judge Black (*11 Ibid, 49*).—See also *8 Op. of Att'y Gen'l, 247, 255 ; 9 Ibid, 41.* Also *Kissell v. St. Louis Public Schools, 18 How., 19; Railroad Co. v. Fremont Co., 9 Wall, 94.* These opinions of very eminent lawyers are worthy of high consideration, especially as when giving them they were the official advisers of the government, and their advice was accepted and acted upon by the department of the interior. The government has thus given a practical construction to its own grants, which the state authorities should accept and follow, unless it is found that the proper judicial authority of the federal government has reviewed and found it erroneous; which it is not pretended is the case, unless by the decision in *1 Black* above referred to. And we have already said we find that case to furnish no distinct support to defendant's position.

No court is at liberty to subject these sovereign legislative grants, which more partake of the nature of treaty cessions by the Union to one of its members than of individual bargaining, to the definitions and refinements which

the rules of municipal law apply to the grants and conveyances from man to man.   When the government conveys by act of congress, that which constitutes its deed at the same time constitutes the law which defines the right or estate, and stamps it with whatever character it possesses. And so long as the government is only dealing with its own, the right or estate granted, whether anomalous or unprecedented, or otherwise, will be entitled to recognition and effect for just what it appears and was intended to be.— *Ballou v. O'Brien, 20 Mich., 304.*

It is unnecessary that the grant should be capable of being brought within any of the definitions given to estates by the common law.   The one here examined seems to have been intended as a present conditional bounty to the state to encourage the building of railroads, and to become absolute and to attach to specific lands when the terms of the donation should be complied with.   To devote the lands to this specific purpose, and work a transfer of the title, no further conveyance by the federal government was contemplated; it is assumed that a transfer of title was absolutely involved in the act itself and what should be done under it, and moreover that precautionary provisions were needed to meet the contingency of non-performance of the condition, and bring back the title to the federal government.

The state, then, had the title, though of course it was a floating title, not attaching to any particular parcels until the proper action should be had under the congressional grant to entitle some intended beneficiary to select and convey them.—*Rutherford v. Greene's heirs, 2 Wheaton, 196.* On the 14th day of February, 1857, the legislature passed an act which, referring to the grant by congress, declared that so much of the lands, franchises, rights, powers and privileges as were or may be granted and conferred in pursuance thereof to aid in the construction of a railroad from Amboy, by way of Lansing, to some point on or near Traverse Bay, "are hereby disposed of, granted to, con-

28 MICH.—49.

ferred upon and vested in the Amboy, Lansing & Traverse
Bay Railroad Company." The act went on to provide for
a formal acceptance of the grant by the company, and that
it should be the duty of the company on or before the first
day of December then next to locate the line of its rail-
road and to make complete maps of the line and file copies
in the offices of the governor and secretary of state, and
the governor was required to transmit a duplicate to the
land office at Washington. The seventh section of the act
provided that the company, after the completion of twenty
continuous miles of its road, and after the governor should
have certified to the secretary of the interior that such
twenty continuous miles of its road were completed, then,
and not before, might sell sixty sections of land included
within any continuous twenty miles of its line of road, and
in like manner upon the completion of each other twenty
continuous miles it might sell other sixty sections, and so
on from time to time until the whole of its road was com-
pleted. The company was required to complete the road
between Hillsdale and the point of intersection with the
Detroit & Milwaukee Railroad on or before the first day of
November, 1859, and at least twenty continuous miles of
the road every year thereafter until the entire road was
completed, the whole to be finished by the first day of No-
vember, 1865.—*Sess. L. 1857, p. 346.*

It is presumed that the company filed a formal accept-
ance of this grant, as there are several acts of the legisla-
ture recognizing its rights under it, of which such as are
material will be alluded to further on. The company filed
the map of location of its line in the office of the secretary
of state in August, 1858, and though this was not in time,
the *laches* was waived by subsequent legislation. By act
of February 14th, 1859 (*Sess. L. 1859, p. 442*), the quan-
tity of land that might be sold on the completion of twenty
continuous miles of road was increased to one hundred and
twenty sections. An act of February 12, 1861, required
twenty continuous miles of road to be completed and in

good running order by the first day of January then next (*Sess. L. 1861, p. 32*); and a later act of the same session provided that the company should not be entitled to the second one hundred and twenty sections until it should have constructed the road and opened it for use from Owosso to Michigan avenue in Lansing.—*Sess. L. 1861, p. 150.*

Previous to the legislation of 1861 the company are shown to have completed twenty continuous miles of its road from the intersection with the Detroit and Milwaukee railroad in the city of Owosso in the direction of Lansing, and had obtained the governor's certificate to the secretary of the interior to that effect.

This would entitle the company under the acts of 1861 to make sale of one hundred and twenty sections of land on any continuous twenty miles of its road. On the 19th day of March, 1863, another act of the legislature was passed which waived all forfeitures, but required the company within six months from the passage thereof to finish and open their road for use to Michigan avenue, in the city of Lansing, and also by the first day of June then next to commence work in good faith on the road from Owosso to Saginaw City, and by the first day of January, 1865, to complete that portion thereof. And the act contained a proviso that the company should not "be entitled to that portion of the second one hundred and twenty sections of said land not already conveyed by them" until the road should be completed and opened for use to Michigan avenue, in the city of Lansing.—*Sess. L. 1863, p. 284.* We are not advised except by the inference from this act that the company had previously assumed to make sales from the second one hundred and twenty sections, nor do we perceive that it becomes material. On the 17th day of September, 1863, the governor certified to the secretary of the interior that the road was constructed and opened for use to Michigan avenue, in the city of Lansing, stating therein that he did so "in order that it may appear that

the said railway company now has title to the second one hundred and twenty sections of land so granted by said act of congress, and referred to in said act of the legislature of the state of Michigan, approved March 19, 1863."

This certificate would seem to entitle the company to make sale of the second one hundred and twenty sections of land, unless some action was required of the public authorities in order to determine what lands should be sold, or of the company in selecting them. The defendant insists that there must have been a designation by or under the authority of the state before the floating right could attach to specific descriptions. That might be true if the right of selection was in the state; but such does not seem to be the case. The company having become entitled to two hundred and forty sections of land, might take one hundred and twenty sections thereof within any continuous length of twenty miles of their road, and the other one hundred and twenty sections within any other continuous length of twenty miles thereof, and the state could not force selections upon it. And as no legislation required any particular form or method of selection, when the proper quantity of public land was found within the requisite distance of the road, we are unable to perceive why a sale by the company of specific parcels of land, not exceeding the quantity earned, and lying within the limits specified in the grant, would not to that extent have been an effectual selection.

We come now to the legislation of 1865: on the 18th day of March of that year an act of legislature was passed which provided that it should be lawful for the Jackson, Lansing & Saginaw Railroad Company, or any other railroad company, to enter into an arrangement with the Amboy, Lansing & Traverse Bay Railroad Company, for the location of its line of railroad from Lansing by way of Owosso to Saginaw, upon the line of said Amboy, Lansing & Traverse Bay Railroad, and for the construction of the same on such line, and in case of such arrangement

and location, then, upon filing in the office of the secretary of state a copy of the agreement between the companies duly certified as in the act provided, said Jackson, Lansing & Saginaw Railroad company, or other railroad company, shall become entitled, in accordance with said arrangement, to receive, take, hold, sell and dispose of the lands granted by congress to aid in the construction of said line of road, as the said Amboy, Lansing & Traverse Bay Railroad company might have done under existing laws if such road from Owosso to Saginaw had been constructed by it, and the right of said Amboy, Lansing & Traverse Bay Railroad company to such lands, so far as the portion of its road from Owosso to Saginaw is concerned, shall cease upon the filing of said copy of agreement in the office of the secretary of state. And under the second section full authority was conferred upon the Jackson, Lansing & Saginaw company to purchase at private, public or judicial sale, the railroad and property of the Amboy, Lansing & Traverse Bay company.

It is reasonable to infer that this legislation was adopted at the instance of the two companies mentioned therein by name, and in contemplation of an arrangement between them. Such an arrangement however does not seem to have been formally entered into between the parties until the 26th day of October, 1866, when a contract was executed as hereinafter stated. Meantime, on the 28th day of November, 1865, the Amboy, Lansing, & Traverse Bay Railroad company executed a deed purporting to convey to Andrew C. Maxwell and others a considerable quantity of lands, embracing the lot on section seventeen now in controversy. This deed recited the legislation already referred to including that of 1863, the construction of the road from Owosso to Lansing, and the giving of the two certificates by the governor, and it then contains a further recital that "Whereas the board of control of railroads of the state of Michigan, at a meeting held on or about the third and fourth days of September, 1861, did select one

hundred and twenty sections of land which said Amboy,
Lansing & Traverse Bay Railroad company were then
entitled to sell, being all the lands granted by the United
States as aforesaid, lying on both sides of the line of said
road extending from the south line of township six north,
to the north line of township eighteen north, including all
the railroad lands granted by the United States aforesaid
in 'the odd sections' within the limits on each side of the
route of said road, excepting such portions of said sec-
tions as have been previously sold by the United States,
and excepting also such parts thereof as have been previ-
ously secured to actual settlers and occupants, under the pro-
visions of the laws of the United States in regard to the
pre-emption of the public lands; and whereas the said board
of control at the meeting aforesaid did further resolve that
the said Amboy, Lansing & Traverse Bay Railroad com-
pany should be entitled to sell a second one hundred and
twenty sections of said lands, whenever the governor of said
state should certify that the said road was completed from
Owosso aforesaid to Michigan avenue in the city of Lan-
sing aforesaid; and whereas the said road has long since
been completed from Owosso to Michigan avenue aforesaid,
and the lands hereafter described are a portion of those
included in the grant aforesaid, and selected between said
township six north and said township eighteen north; and
whereas the said board of control of railroads did further
resolve that said lands should first be taken from the south
towards the north, taking all of said lands in that manner,
as they might happen to be situated, on the route of said
road, and the lands heretofore mentioned are included in
said resolution;" therefore the deed proceeded to convey to
the grantees named a number of parcels of land situated
in four adjoining townships, and none of which, if the
townships were of the usual size, could have been situated
a distance of more than twenty miles from any other. The
quantity covered by this conveyance was about seven thou-
sand acres, equivalent to about eleven sections, and there

was no evidence in the case that further conveyances had been made by the company.

Unless, therefore, there was necessity for the action of the board of control which is recited in this deed, so that it became important that plaintiff should prove such action to have been taken, it would seem that the action of the Amboy, Lansing & Traverse Bay Railroad company in making this conveyance was strictly within the limits of its legal right, and that it transferred the title to the grantees named. No provision of law has been pointed out to us on the argument which would qualify this right, or subject it to any conditions not performed or waived. The act of 1857 before referred to, which created the board of control, does not appear to have vested them with any power over the lands conveyed by the grant except in two contingencies: *First.* Where the conditions of the grant were not complied with by any company, they might declare a forfeiture and select a new beneficiary; and *second*, when rights conflicted by reason of railroad lines crossing or approaching each other, they were to adjust any controversy.—*Sections 11 and 15.* And in this view of the case it would seem unnecessary to consider the subsequent arrangement between the Amboy, Lansing & Traverse Bay company and the Jackson, Lansing & Saginaw company, and the legislation following the same, by which it is agreed on both sides that the beneficial interest in the land grant was transferred to the last named company. This transfer could not affect rights previously acquired by third parties, and we have consequently no occasion to examine the contract between the two companies to determine whether or not there was a reservation by it of the lands already earned, or on the other hand, a restriction of the agreement to such as might be earned by the construction of the road north of Owosso, and whether in either case the act of the legislature of February 7, 1867, could operate by way of a declaration of forfeiture to vest in the Jackson, Lansing & Saginaw company greater rights than were intended

to be given it by the contract between the two companies. And it may be remarked of this branch of the case, that the position of the defendant rests not on equities, but on technicalities, and all reasonable inferences of construction should be against it. Beyond dispute the Amboy, Lansing & Traverse Bay Railroad company became entitled to two hundred and forty sections of land, and it wronged nobody by taking the lands here in question as part of them, but on the contrary, that company had an unquestionable legal right to take them, unless the legislation under which they were acting required some formality to be observed by the state authorities in' advance. Any such formality in the case could have been of no service to any other party; the authorities could not rightfully have withheld it, and it could have had no beneficial object in view. We ought not, therefore, to conclude it to be necessary, unless we find it plainly required, especially in behalf of a party which claims the land by virtue of what it insists is a technical forfeiture under the act of February 7, 1867.—*Sess. L., p. 11.* We have not, for reasons before given, examined that act in this opinion to determine whether it can be treated as a forfeiture, but we are clear there was no right to forfeit what was already earned, and that the conveyance made to Maxwell and others was not open to objection either by the state or by the general government. As the plaintiff claims under the deed to Maxwell and his associates, we think he has established his right to the logs cut on section seventeen. The government afterwards patented this land to the Jackson, Lansing & Saginaw Railroad company, but that patent was unimportant, as the government at the time had no title.

The other branch of the case relates to the logs cut on section one, township fourteen north, of range three east. The plaintiff claims the logs under Daniel Burns, who cut them in the winter of 1868-9, having first applied at the land office for the purchase of the land in the usual way, but never having actually made the purchase. The

logs, when cut, were seized by the federal officers, but released by the receiver of the land office in consideration of a small payment, and a bill of sale was given by him as United States timber agent therefor. On the other hand, the defendant shows that this land was within the congressional land grant before mentioned; and that it was patented to the Jackson, Lansing & Saginaw Railroad company in March, 1871, having been actually earned previous to the time when Burns applied to purchase it, by the construction of their line of road from Owosso to Wenona.

We think the plaintiff had no title whatever to these logs. The effect of the land grant to the state, and the subsequent location of the line of the road, was to place the sections which were covered by the floating grant out of the body of lands subject to sale by the federal government. Burns, consequently, could acquire no right to cut timber on the land, or even to go upon the land, by virtue of any application to purchase, if such right could be acquired by an applicant under any circumstances. And we are of opinion that no right was acquired by the compromise with the receiver, for reasons which we shall proceed to give.

There is no claim, as we understand it, that there had been any forfeiture of the land grant, or any portion thereof, after the Jackson, Lansing & Saginaw company had become the beneficiary. The grant originally was to be forfeited, and the land to revert, unless the road was constructed within ten years from its passage. Extensions were made by act of July 3, 1866 (*Laws 1865–6, Little and Brown's ed., p. 78*), and again by act of March 2, 1867 (*Laws 1866–7, Little and Brown's ed., p. 425*), and these, with the patent which was given, would waive any forfeiture that might affect this land if any such had occurred. And it must be taken as an unquestionable fact that the Jackson, Lansing & Saginaw company became entitled to the land on this section one, by reason of its original appropriation to the purposes of the construction of their road, and of

their having complied with such conditions as entitled them to a patent. And that company might have made sale of the lands without waiting the issue of any patent, but for the provisions of the act of July 3, 1866, one of which contemplates that titles shall pass by patent only. It is unnecessary for the purposes of this case to consider whether the patent was or was not in fact made necessary by this act. It is clear that after the patent issued the Jackson, Lansing & Saginaw company had undoubted title to this land.

The question that concerns these parties is as to the title, the right of control, and the duty to protect the lands, previous to the perfecting of the title in the Jackson, Lansing & Saginaw company. And this must depend either upon the construction of the original grant, or upon the force of the patent.

The grant was made to the state *in presenti,* but in the nature of a float, of the sections designated by odd numbers for six sections in width on each side of the road when located, and in a certain contingency, of others to be selected. It could not pass particular sections immediately, because the location of the road was essential to determine what sections would be brought within the limits of the grant; and even when the line was located, it would be highly probable that those limits would either embrace more land falling within the terms of the grant than could be conveyed in pursuance thereof, or that it would fall short of that precise quantity. It might under such circumstances be a question of considerable interest and importance whether the duty of protecting the land grant against trespassers was devolved upon the state by the grant, when the grant itself as yet attached to no definite parcels of land, and while it was uncertain whether all the odd-numbered sections along any particular portion of the line of the road might or might not be eventually taken by the railroad company, or whether some portion of the grant might not be located elsewhere in consequence of the..

previous sales and pre-emption selections within the limits of six sections in width on each side of the road, leaving less than the requisite quantity to fulfill the terms of the grant. But this question we shall not discuss, because it seems to us that the subsequent action renders it immaterial to the question at issue between these parties.

Assuming that the land officers of the United States were still charged with the duty of protecting these lands against trespassers, and that they might and should take all proper legal proceedings to punish them, it is certain that they had no authority by virtue of their office, or under any regulation or practice of the land office to which we have been referred, to sell off the timber from these lands to any person whomsoever, and thereby deprive the railroad company of a portion at least of the benefit intended by the grant. The grant was of the lands in their existing condition; the government reserving to itself no right to sell timber or to derive any benefit therefrom; and any sale of timber, to the extent of its value, or to the extent that it depreciated the value of the land, would defeat the purpose had in view by the government in making the grant. If it be said, however, that in case of the cutting of timber by trespassers before the grant has attached to particular parcels, there must be authority somewhere to seize the timber and make sale of it, holding the proceeds in trust for the benefit of the person eventually entitled, or otherwise the timber cut must be left to the disposition of the trespasser himself or suffered to go to decay,—we may concede this without a modification of any thing we have already stated. The right to do what may be necessary to protect the land against trespassers is one thing; the right to sell off the timber as against the party entitled to the benefit of the grant is quite another and a different thing.

It has already been seen that the lands on section one, among others, were earned by the Jackson, Lansing & Saginaw Railroad company, according to the terms of the grant,

and the recitals in the patent, which are good evidence on this point, show this to have been as early, at least, as January 7, 1868. The logs in question were cut by Burns in the following winter, and they have been taken under the authority of the Jackson, Lansing & Saginaw Railroad company as having become their property. The patent was issued to that company in March, 1871. And the question on this branch of the case would seem to be this: At what time is the title of the railroad company to be deemed in law to have accrued?

There are three periods, any one of which, according to different views, might be taken as that from which the title of the railroad company was to date; that is to say, the time of the original grant to the state, the time the lands were earned and the governor's certificate of that fact filed, and the time of the issue of the patent. And the last must undoubtedly be the time, unless, under a well known and very beneficial fiction of law, the patent when given was to relate back to one or the other of the two periods first mentioned. And if it relates back to either of these, as both were before the logs were cut, then in law the land would be deemed the land of the company at the time the logs were cut, and they had a right to follow and seize the logs as their property.

In *Viner's Abridgement, Tit., Relation, E,* it is stated that "where there are divers acts concurrent to make a conveyance, estate or other thing, the original act shall be preferred, and to this the other acts shall have relation." In *Cruise* the doctrine is stated in words somewhat different. "All the several parts and ceremonies," that author says, "necessary to complete a conveyance shall be taken together as one act, and operate from the substantial part by relation."—*Cruise Dig., Vol. 5, 510-11.*—See also *4 Kent, 337, 454; Wash. Real Prop., Book 4, ch. 4, § 2; Jackson v. Ramsay, 3 Cow., 75; Clark v. Hall, 19 Mich., 354; Clark v. West, 23 Mich., 242.* This doctrine has been so often applied by the federal courts to grants or donations by the

general government that it seems unnecessary here to do more than to refer to a few of the cases. Those of *Ashton v. Hammond, 3 McLean, 107; Ross v. Barland, 1 Pet., 655; U. S. v. Fitzgerald, 15 Pet., 407; Landes v. Brant, 10 How., 348; Lessieur v. Price, 12 How., 76; French's Lessee v. Spencer, 21 How., 239; Witherspoon v. Duncan, 4 Wall., 210; Stark v. Starrs, 6 Wall., 402,* are directly in point. The following cases in the state courts are like them in principle: *Johnson v. Stagg, 2 Johns., 520; Jackson v. Dickenson, 15 Johns., 309; Fuller v. Van Geesen, 4 Hill, 171; McLaren v. Insurance Co., 5 N. Y., 151; Richardson v. Cleaveland, 5 Port., 251; Jones v. Inge, Ibid., 327; Smith v. Allen, 1 Blackf., 22; Heywood v. Hildreth, 9 Mass., 393; Taylor v. Robinson, 2 Allen, 564; Stout v. Keyes, 2 Doug., Mich., 184; Crowley v. Wallace, 12 Mo., 143; Papin v. Massey, 27 Mo., 445; Magwire v. Tyler, 40 Mo., 406; Hayward v. Ormsbee, 11 Wis., 3; Cavender v. Smith, 3 Greene, Iowa, 349, S. C., 5 Iowa, 157; Rogers v. Brent, 5 Gilm., 573; Dequindre v. Williams, 31 Ind., 444.* These cases apply the doctrine under a great variety of circumstances, and they show, what is expressly declared in some of them, that while it is never to be applied to the injury of innocent parties, it is exceedingly effectual to the attainment of justice as against trespassers. And Burns in this case can only stand in that light.

As already said, whether the relation of the patent is to be to the original grant, or to the time when the land was earned,—that is to say, whether the one or the other is to be deemed, in the words of Mr. Cruise, "the substantial part" of the necessary steps in perfecting title, is in this case immaterial. To one or the other the patent clearly relates. We may say of the case, in words slightly changed from those employed by the federal supreme court in *Lessieur v. Price, 12 How., 76,* that the land was granted by the act of 1856; it was a present grant, wanting identity to make it perfect; and the railroad company was vested with full power to select and locate the lands; and the selection

when made pursuant to the act of congress gave precision to the title, and attached it to the land selected. And from the time, at least, when there was a right to select and locate that which was afterwards selected and patented, the railroad company must be deemed owner of the land. Upon this branch of the case, therefore, we find no error in this record. For the error on the other branch the judgment must be reversed.

We cannot, as the plaintiff insists, enter a final judgment on his behalf in this court. True, the jury found specially the value of the logs on section seventeen, but we have no means of knowing how the jury made up the amount of the verdict returned by them,—what they included or what they rejected. It will be necessary, therefore, to order a new trial.

GRAVES, CH. J., and CHRISTIANCY, J., concurred.

CAMPBELL, J., did not sit in this case.