THE JACKSON, LANSING & SAGINAW RAILROAD COMPANY
v. CROZIER DAVISON.

*Railroad land-grant—Construction of legislative enactment—Selection of lands by company—Conflicting claims—Bona fide purchaser—Notice.*

Complainant filed a bill to set aside a mortgage held by defendant, as a cloud on its title to certain real estate, and a decree was made in the lower court granting the relief prayed for, from which defendant appealed, and on the original hearing the decree was reversed and the bill dismissed. A rehearing was ordered, on which the majority of the Court concurred in affirming the decree of the circuit court. The controversy is so essentially one depending on questions of fact, that a statement of the main

questions decided involves a summary of the opinions, to which reference is had. In passing upon the case the following abstract propositions seem to be stated:

1. A grant of lands by legislative enactment differs from one by a private person, in that it is both a *grant* and a *law*; and, as such, the *intent* of the law is to be kept in view, and its purpose effectuated, whenever the subject-matter of the grant comes in controversy; and that construction must be placed upon it which will preserve and carry out the *object* of the Legislature, however such construction may conflict with the principles of the common law, or prevent the attaching of equities which would spring from transactions between private parties.

2. The general rule is that one having knowledge of *distinct* facts affecting the title to land which he is about to purchase is not at liberty to close his eyes, and then screen himself under a plea of ignorance of *other* facts connected with those already known to him; but he is bound in good faith to make reasonable inquiry, and will be presumed to have done so, and will be affected with notice of all such facts as he might have learned by such inquiry.

Appeal from Bay. (Green, J.) Argued February 9 and 10, 1887. Decided April 14, 1887.

Bill to set aside a mortgage. Defendant appeals from decree granting relief prayed for. Reversed on original hearing, and affirmed on rehearing. The facts are fully stated in the opinions.

*Hatch & Cooley,* for complainant.

*Wisner & Draper* and *B. M. Thompson,* for defendant.

CHAMPLIN, J. The bill of complaint is filed for the purpose of removing a cloud upon the title of the complainant to the west half of the south-west quarter, the south-east quarter of the south-west quarter of section 11, the north half of the south-west quarter of section 15, and the north-west quarter of section 23, all in township 14 north, range 4 east, caused by a mortgage executed by Andrew C. Maxwell and wife to defendant, covering said lands and other land.

Nearly all the legal points involved in this case were passed

upon and settled in the case of *Johnson v. Ballou*, 28 Mich. 379.

The lands in question here are embraced in the grant from Congress of June 3, 1856 (11 U. S. Stat. at Large, 21).

The history of the grant, and the several acts of the Legislature of the State of Michigan relating thereto, so far as the land in controversy is concerned, will be found stated at length in the opinion of Mr. Justice COOLEY in the case of *Johnson v. Ballou*, and need not be repeated here.

It was there held, with reference to the east half of the south-east quarter of section 17, township 14 north, range 4 east, which passed through the same chain of title from the United States to Maxwell and others as the lands in question here,—

1. That the title of the land vested in Maxwell and others by virtue of the conveyance to them by the Amboy, Lansing & Traverse Bay Railroad Company, of date November 28, 1865.

2. That the act of Congress constituted a present grant of the lands included within its terms to the State, devoted to a particular purpose, and no further conveyance by the federal government was contemplated.

3. That the State then had the title, although it was a floating title, and did not attach to any particular lands until the proper action should be had under the congressional grant to entitle some intended beneficiary to select and convey them.

4. That the Legislature, by the act of February 14, 1857, granted, conferred, and vested in the Amboy, Lansing & Traverse Bay Railroad Company so much of the lands, franchises, rights, powers, and privileges as were or might be granted and conferred by said act of Congress, to aid in the construction of a railroad from Amboy, by way of Lansing, to some point on or near Traverse bay.

5. That the right of selection was in the railroad company, and not the State, after they had been earned, and a sale by the company of any specific parcels of land, not exceeding the quantity earned, and lying within the limits specified in the grant, would, to that extent, be an effectual selection.

6. That the Board of Control could not qualify the right

of selection, or subject it to any conditions not performed or waived.

7. That the act which created the Board of Control did not appear to have vested them with any power over the lands conveyed by the grant, except in two contingencies, neither of which are material here.

8. That, beyond dispute, the Amboy, Lansing & Traverse Bay Railroad Company became entitled to 240 sections of land, and wronged nobody by taking the lands here in question as part of them, unless the legislation under which they were acting required some formality to be observed by the State authorities in advance, and that any such formality would be of no service to any other party.

9. That the authorities could not have rightfully withheld it, and it could have had no beneficial object in view.

10. That no patent from the United States, or from the State of Michigan, was requisite to vest the title in the railroad company independent of the legislative grants.

It appeared in that case, and also in this, that the Amboy, Lansing & Traverse Bay Railroad Company had only earned and become entitled to 240 sections of land, and this amount, by the act of Congress, as well as by the enactments of the State of Michigan, this company was authorized to sell or convey; and hence it was held that its conveyance to Maxwell and others passed the title to them; and this will be our holding now, unless some new facts appear in this record which call for a different ruling.

In speaking of the conveyance by the railroad company to Maxwell and others, in *Johnson v. Ballou,* Judge COOLEY says:

" The quantity covered by this conveyance was about seven thousand acres, equivalent to about eleven sections, and there was no evidence in the case that further conveyances had been made by the company."

In the present case it is charged in the bill of complaint, and proven by the evidence, that on the ninth of November, 1861, the Amboy, Lansing & Traverse Bay Railroad Company executed and delivered to Henry Day, of New York, a deed, thereby conveying to him a portion of the lands

selected by said railroad company from those granted by act of Congress, in said deed fully describing such lands, aggregating in amount 87,693.13 acres; which deed was recorded in the office of the register of deeds for Bay county on the twenty-first day of November, 1861, in Liber G of Deeds, at page 79, which deed was afterwards confirmed by another deed from said railroad company, bearing date October 7, 1863, and recorded in the office of the register of deeds for Bay county on the twenty-third day of April, 1864, in Liber K of Deeds, at page 28.

That on the said ninth day of November, 1861, said railroad company made, executed, and delivered to William H. Chapman and Benjamin O. Williams, as trustees, a mortgage, therein describing another portion of said lands, aggregating in amount 65,275.74 acres, to secure the payment of $200,000 of the bonds issued by said railroad company. This mortgage was recorded November 21, 1861, in the aforesaid register's office, in Liber C of Mortgages, at page 518. In and by said mortgage the trustees were authorized to make sale of the lands directly to the bondholders in payment of their bonds. The trustees, on various occasions, exercised this power, and made sales of land directly to the bondholders in payment of bonds held by them, and, among others, to Maxwell.

On June 4, 1865, the trustees filed their bill of complaint in the circuit court for the county of Shiawassee, in chancery, against said railroad company, for the purpose of obtaining a foreclosure and sale of such lands as had not previously been sold by them. Amos Gould was afterwards admitted as a complainant; and thereafter such proceedings were had that on the nineteenth day of April, 1867, a decree was entered finding the amount outstanding and due upon said mortgage to be $199,795.87, and authorizing a sale of the lands covered by the mortgage not previously sold by the trustees to satisfy the mortgage. This was done, and the

title to the lands became vested under such sale in different purchasers.

On November 12, 1861, the Amboy, Lansing & Traverse Bay Railroad Company executed and delivered to Halmer H. Emmons a deed of another part of said lands not before conveyed, amounting in the aggregate to 800 acres. None of the lands in dispute here are contained in the several conveyances above specified. The total number of acres conveyed by the railroad company in the three conveyances named aggregate 153,768.87 acres, which exceeds the total number of acres contained in 240 sections by 168.87 acres.

The deed from the railroad company to Maxwell, Campbell, and Van Etten, above referred to, and mentioned in the case of *Johnson v. Ballou*, was not made until November 28, 1865, more than four years after the railroad company, as is alleged, had conveyed all the lands which it had earned, or had any right or power to convey; and upon this ground complainant claims that no title passed to Maxwell, Campbell, and Van Etten by virtue of the deed of November 28, 1865. Whether this is so or not depends upon the language of the grant from Congress in the act of June 3, 1856.

The third section of that act declared—

"That the said lands hereby granted to the said State shall be subject to the disposal of the Legislature thereof, for the purposes aforesaid, and no other."

The fourth section enacts—

"That the lands hereby granted to said State shall be disposed of by said State only in manner following, that is to say: That a quantity of land, not exceeding one hundred and twenty sections for each of said roads, and included within a continuous length of twenty miles of each of said roads, may be sold ; and, when the Governor of said State shall certify to the Secretary of the Interior that any twenty continuous miles of any of said roads is completed, then another quantity of land hereby granted, not exceeding one hundred and twenty sections of each of said roads having twenty continuous miles completed as aforesaid, and included within a

continuous length of twenty miles of each of said roads, may be sold; and so, from time to time, until said roads are com· pleted."

This language of the act, referring to the quantity that may be sold, is manifestly a limitation of power upon the State to convey. The evident intent of the grant was that the bounty, aside from the first 120 sections, should be bestowed so fast and no faster than 20 continuous miles of road should be constructed. This would prevent the, State or the railroad company from conveying away lands unearned, which, were it possible to do, might result in conveying away all the lands granted, without constructing the roads at all; and thus the object of Congress in granting the bounty might be frustrated. I am of the opinion, therefore, that, if the conveyances mentioned above conveyed the lands actually earned, and no others, no title passed to Maxwell, Campbell, and Van Etten of the lands described in the bill of complaint, and which were included in the deed from the railroad company to them, of date November 28, 1865.

It is claimed by the counsel for the defendant that, if this Court should reach the result last stated, yet the deed to Maxwell and others operated, by what subsequently transpired, to vest in them a title in fee simple, upon the doctrine of relation. To properly consider this question, it will be necessary to state somewhat in detail events which occurred subsequently to the giving of the Maxwell deed, and of an act of the Legislature of the State of Michigan passed in March preceding.

On the eighteenth day of March, 1865, the Legislature passed an act which provided that it should be lawful for the Jackson, Lansing & Saginaw Railroad Company, or any other railroad company, to enter into an arrangement with the Amboy, Lansing, & Traverse Bay Railroad Company, for the location of its line of railroad from Lansing, by the way of Owosso, to Saginaw, upon the line of the

Amboy, Lansing & Traverse Bay Railroad, and for the construction of the same upon such line, and, in case of such arrangement and location, then upon the filing in the office of the Secretary of State a copy of the agreement between the companies, duly certified as in the act provided, said Jackson, Lansing & Saginaw Railroad Company, or other railroad company, shall become entitled, in accordance with said arrangement, to receive, take, hold, sell, and dispose of the lands granted by Congress to aid in the construction of said line of road, as the Amboy, Lansing & Traverse Bay Railroad Company might have done under existing laws, if such road from Owosso to Saginaw had been constructed by it, and the right of said Amboy, Lansing & Traverse Bay Railroad to such lands, so far as the portion of its road from Owosso to Saginaw is concerned, shall cease upon the filing of the copy of the agreement in the office of the Secretary of State.

Full authority was conferred upon the Jackson, Lansing & Saginaw Company to purchase, at private, public, or judicial sale, the railroad and property of the Amboy, Lansing & Traverse Bay Railroad Company.

This act would indicate that some arrangement between the companies named was contemplated which led to its passage, but such agreement was not fully consummated until the sixth of October, 1866. In the meantime the deed to Maxwell and others was executed.

The agreement of October 6, 1866, witnessed that said companies, in order to secure the early completion of the line of railroad from Owosso to the Saginaw valley, and from thence to the waters of Lake Michigan, under arrangements mutually beneficial, have for good reasons and valuable considerations contracted with each other as follows:

1. The Jackson, Lansing & Saginaw Railroad shall be lo-

cated on the line of the Amboy, Lansing & Traverse Bay Rail-road, from Owosso to Bay City.

2. The Jackson, Lansing & Saginaw Railroad Company shall complete its road so as to avoid forfeiting the land grant under the act of July 3, 1866.

3. The Amboy, Lansing & Traverse Bay Railroad Company conveys to the Jackson, Lansing & Saginaw Railroad Company all its road, franchises, and lands and rights acquired under land grant of Congress.

The act of July 3, 1866, referred to, extended the time seven years for the Amboy, Lansing & Traverse Bay Railroad Company to complete its road, and again authorized the Legislature to confer the grant on some other than the Amboy Company, unless—

1. It builds twenty miles of road-bed, between Owosso and Saginaw, by the first day of February, 1867.

2. Fully completes said 20 miles by the first day of November, 1867.

3. Fully completes 20 miles a year thereafter, and fully completes the road by the time limited in the act.

A bill had been filed in the circuit court of the United States for the Eastern district of Michigan to foreclose the mortgage executed to Chapman and Williams, and such proceedings were had thereunder that a sale was made by the master in chancery to the Jackson, Lansing & Saginaw Railroad Company. The deed bears date January 4, 1867.

Campbell and Van Etten, two of the grantees in the deed from the Amboy, Lansing & Traverse Bay Railroad Company, on August 5, 1868, conveyed their interest in the lands in question to Maxwell.

The Jackson, Lansing & Saginaw Railroad Company went on and built the road, and earned the balance of the lands not already earned by the Amboy Company, and received patents for the lands from the United States.

In October, 1869, the Jackson, Lansing & Saginaw Railroad Company filed its bill of complaint against Maxwell, Campbell, and Van Etten, and others, praying for a cancel-

lation of the title held by them, and which they claimed to have derived from the Amboy Company. Answers were put in, proofs taken, and, upon the argument in the circuit court, the bill was dismissed, in February, 1874, and the case was appealed to the Supreme Court, and, while pending, was settled by the parties by a contract executed October 15, 1874. While negotiations were pending for a settlement, Andrew C. Maxwell and his wife made, executed, and delivered a mortgage to defendant, Crozier Davison, covering the lands in question, and a large amount of other real estate, to secure the payment of $25,000, with interest at 10 per cent., five years from that date.

The contract of settlement was as follows:

"Memorandum of an agreement made the first day of September, A. D. 1874, between the Jackson, Lansing & Saginaw Railroad Company, of the one part, and Andrew C. Maxwell, George Campbell, and George H. Van Etten, of Bay City, Michigan, of the other part.

"Whereas, a litigation involving the title of the lands mentioned in the schedule hereto attached has for some time existed; and whereas, the parties have decided to adjust said litigation; therefore it has been agreed as follows:

"*First.* The said Jackson, Lansing & Saginaw Railroad Company is to sell to said Campbell, Maxwell, and Van Etten, subject, of course, to their claim of title, or that under which they have claimed to hold, all of said lands, with the exceptions and subject to the conditions hereinafter mentioned, for the sum of five dollars and fifty cents per acre; and subject also to all taxes and tax titles, except to one-half the taxes of 1873; and except such bids, purchases, or tax titles as may be held by agents of the complainant, now remaining on such of said lands as neither party has sold or contracted.

"*Second.* As to all of said lands which have been deeded by said railroad company, and not sold by said Campbell, Maxwell, and Van Etten to third parties, their claim of title being still in their power, or in the power of some of them, they, in such cases, are to confirm the sales made by said railroad company on such terms, and for such amount or prices for their title, as they may be able to obtain of the holders of the titles under said railroad company, provided they can obtain enough additional prices which, together with that

heretofore agreed to be paid or paid to the railroad company, shall amount to the fair value of such lands; and the gross or total prices obtained for such lands by both parties shall be equally divided, so that the said railroad company shall receive half, and said Campbell, Maxwell, and Van Etten half.

"*Third.* As to such of said lands as have been sold, but not deeded, by the railroad company, the land shall be conveyed to the defendants, subject to the outstanding contracts given by the railroad company,—the grantees assuming the liabilities of the railroad company under its contract; but the railroad company is to have five dollars and fifty cents an acre for the same, and so much of the prices as have been received by the railroad company from the parties to whom it has been sold shall be deducted from the said sum to be paid to said Campbell, Maxwell, and Van Etten, on account of said sales, and the contract shall be transferred to them with the conveyance of the legal title, subject to such contracts.

"*Fourth.* As to all of said lands which the railroad company has deeded to different parties,—that is, when said railroad company has deeded to one third party, and said Campbell, Maxwell, and Van Etten, or some of them, have sold to some other third party, so that the adverse titles or equitable interests are held by third adverse parties,—in such cases, the said railroad company is not to be required to make any further conveyances, except to assignors, and transfer its securities and mortgages, if any exist; but the said Campbell, Maxwell, and Van Etten are to adjust the conflicts between the adverse titles on such terms as they may be able to make with the holders of the same, always indemnifying the said railroad company against all damages, expenses, and charges in consequence of its said outstanding deed of conveyance, or any covenants therein; and all conflicts of title are to be fully and completely adjusted by said Campbell, Maxwell, and Van Etten, so that the said railroad company be not involved in further loss, expense, or damage on account of the conflict of titles; and this indemnity shall apply to all lands included in this contract.

"The said Campbell, Maxwell, and Van Etten are to pay to said railroad company, on account of the lands in this (fourth) article, a sum equal to seven dollars per acre for all the lands embraced in this (fourth) clause or article; but the payments which have been received by the railroad company, on account of sales of said lands heretofore made by it, are to be deducted from said sum or prices to be allowed to said

Campbell, Maxwell, and Van Etten, and the balance of prices hereafter to be paid on account of mortgages or securities upon said lands are to move to the benefit of said Campbell, Maxwell, and Van Etten.

"The south-west quarter of south-east quarter of section seventeen, town fourteen north, of range five east, is to be held and regarded as falling under this fourth clause or article.

"*Fifth.* In ascertaining the amount which has been received by, or is payable to, either party, on account of sales heretofore made to third parties, no interest is to be computed; only the principal, without interest, is to be carried into account.

"*Sixth.* On all sums that remain to be paid to said railroad company, in pursuance of this agreement, interest is to be computed at seven per cent. for the first three years, and at the rate of eight per cent. thereafter. All interest is to be paid annually, commencing from and after September 1, 1874.

"*Seventh.* The suit now pending in the Supreme Court of the State of Michigan, between the parties, involving the title of said lands, is to be dismissed without costs to either party, whenever required by both parties to this contract; but the same is not to be affected by this arrangement until the final contracts herein provided for are executed.

"*Eighth.* It is understood that said Campbell, Maxwell, and Van Etten made an arrangement among themselves, effecting a division of said lands, or the proceeds of them, among themselves; and that, therefore, the said railroad company, in making final conveyances or contracts for said lands by specified description, or in detail, will convey or contract particular lands to such one of said parties, or his or their assigns, as said Campbell, Maxwell, and Van Etten may desire, but always without lessening security for unpaid purchase money.

"*Ninth.* After deducting from the price or sum said Campbell, Maxwell, and Van Etten are to pay said railroad company, the said principal sum or sums it has already received on account of sales of said lands, or for which it holds and is to retain satisfactory securities, the balance to be paid by them is to be paid as follows: Cash, on delivery of this contract, three thousand dollars, and balance in four equal annual payments, commencing five years from this date. But if said Campbell, Maxwell, and Van Etten, or either of them, effect sales of any of said lands previous to the time

herein limited for the payment of the sum to be paid by said Campbell, Maxwell, and Van Etten, at least half the price for which said lands are so sold, and never less than eight dollars per acre, shall then become due, and be paid over to said railroad company.

" *Tenth.* Contracts, or deeds with mortgages back, are to be made, in accordance with the intent and meaning of this memorandum, between said railroad company and said Campbell, Maxwell, and Van Etten, separately, for the transfer to each of the lands falling to him under the division they have or may agree on among themselves, and for the payment by them individually of the sums they are severally to pay. In case said railroad company conveys, then a mortgage is to be given back to secure the unpaid purchase money.

"In witness whereof the parties have signed this memorandum this fifteenth day of October, A. D. 1874."

This contract was signed by the parties, and annexed thereto was a list of lands embraced in the agreement, aggregating over 7,000 acres.

Pursuant to this agreement, on the fifteenth of February, 1875, the Jackson, Lansing & Saginaw Railroad Company executed and delivered deeds to Maxwell, Campbell, and Van Etten; they having, by agreement between themselves, partitioned said lands, and the deeds of the railroad company conveyed to each individual his share as agreed upon. The deed to Maxwell conveyed to him the land in dispute, together with other land, and was recorded in the register's office of Bay county, in Liber 6 of Deeds, at page 418, on the sixteenth day of March, 1875.

At the same time, and for the purpose of securing part of the purchase price of said lands, and in accordance with the agreement, Maxwell and his wife made, executed, and delivered to the Jackson, Lansing & Saginaw Railroad Company a mortgage, covering the same lands embraced in the deed, to secure the payment of $10,045.54, in five equal annual payments.

Maxwell made default, and on the nineteenth of June, 1878, a bill was filed by the present complainant to foreclose

the mortgage. Davison was not made a party to this suit. A decree was obtained January 14, 1880, and, on a sale thereunder made on April 30, 1880, complainant became the purchaser.

It also appears that a deed purporting to have been executed on the twenty-eighth day of May, 1867, by the State of Michigan to the Amboy, Lansing & Traverse Bay Railroad Company was received in evidence, which conveys, among other lands, those in controversy in this suit.

It also appears that on the fifth day of September, 1876, the defendant, Davison, executed a release of the east half on the north-west quarter of section 23 from the operation of his mortgage, being a portion of the land in controversy here. No explanation or reason for executing such release is given in the testimony.

I have now stated all the testimony which has a bearing upon the legal validity of defendant's mortgage.

The argument of defendant's counsel, briefly stated, is this: If the point be conceded that the right to sell the land conveyed to Maxwell had not then been earned, and that the title held by him was subordinate to the right of forfeiture, if the Amboy Company had so far constructed its road as to acquire the right to sell the land before any forfeiture was declared, then, clearly, the Maxwell title would have become perfect; that the rights of the Jackson Company in and to the road of the Amboy Company, and in and to the land grant until then held by the Amboy Company, were acquired by purchase from the Amboy Company, with the assent of the Legislature, and that the Jackson Company takes as grantee of the Amboy Company, or, at best, it stands upon this record as the assignee of the Amboy Company; that, at the date of the agreement between the companies, there had been no forfeiture; that the right to sell absolutely 240 sections had been acquired by the Amboy Company; that the right to sell any land on the line of its grant, subject to the

right of forfeiture, was possessed by it.      Neither the United States, the State of Michigan, nor any person or party other than the Amboy Company, could dispose of a foot of the land embraced in the grant.      In any examination of the title to lands embraced within the grant, conveyances from the Amboy Company would alone be looked for; and the complainant, as assignee of the Amboy Company, took the lands subject to Maxwell's rights, and, when it had so far constructed its road that it became entitled to sell the lands in question, Maxwell's title became perfect and absolute.

The fault of this reasoning is that it seeks to apply the principles which relate to common-law grants between private persons to an act of the Legislature, which differs from a grant of a private person in that it is both a grant and a law; and, as such, the intent of the law is to be kept in view, and its purpose effectuated, whenever the subject-matter of the grant comes in controversy; and that construction must be placed upon it which will preserve and carry out the object of the Legislature, however such construction may conflict with the principles of the common law, or prevent the attaching of equities which would spring from transactions between private parties.      *Johnson v. Ballou,* 28 Mich. 384, 385; *Bowes v. Haywood,* 35 Id. 241; *Fenn v. Kinsey,* 45 Id. 446; *Rogers v. Port Huron & L. M. R. R. Co.,* Id. 460; *Schulenberg v. Harriman,* 21 Wall. 44; *Farnsworth v. Minnesota & Pac. R. R. Co.,* 92 U. S. 49; *Missouri, etc., Ry. Co. v. Kansas Pac. Ry. Co.,* 97 Id. 491.

Grants from Congress similar to the one under consideration have been passed upon, in numerous decisions, by the Supreme Court of the United States; and in the case of *Farnsworth v. Minnesota & Pac. R. R. Co.,* 92 U. S. 65, the court said:

"The evident intention of Congress was to secure the proceeds of the lands for the work designed, and to prevent any alienation in advance of the construction of the road, with

the exception of the first one hundred and twenty sections. The act made the construction of portions of the road a condition precedent to a conveyance of any other parcel by the state. No conveyance in disregard of this condition could pass any title to the company. It was so held by this court in *Schulenberg v. Harriman*, 21 Wall. 44, where we had occasion to consider provisions of a statute identical in terms with the one before us."

Keeping these principles in view, let us proceed to examine the questions presented by the record.

The Amboy Company, having earned only 240 sections, and having by the three conveyances as above stated disposed of that amount of land, any other or further conveyance to it by the State was utterly null and void. The deed under which Maxwell claims, dated May 28, 1867, conveyed no estate, either legal or equitable. The State could convey no estate or title to the lands in advance of their being earned by the construction of 20 continuous miles of road. The Amboy Company had no right to sell any land not earned on the line of its road, included in the grant to the State, subject to the right of forfeiture. It did not possess any such right, for the reason that no such right is conferred by the act of Congress, nor is it within the spirit or intent of such act. The State held the title in trust, subject to disposition in accordance with the act of Congress. When it granted to the Amboy Company the lands granted to it, the railroad company obtained the right to earn the lands by complying with the terms of the grant; and, when so earned, its title became absolute to the portion earned; and then, also, and not until then, it became entitled to dispose of such portion. But neither the State nor the railroad company had any right to dispose of or incumber any of the land not so earned, and no right, legal or equitable, could arise out of such disposition in violation of law. To hold the contrary would defeat the intent of Congress in granting the lands as a bounty to aid in constructing the road ; for, if the State may, after the Amboy

Company had completed 20 miles of road, and selected and disposed of the 240 sections to which it was entitled, convey 7,000 acres, it might with equal propriety and legality have conveyed to the Amboy Company the whole quantity of land granted, and left none, in case of failure to construct more, to be conferred upon another company.

To avoid this conclusion, defendant insists that there was no forfeiture, and that the complainant stands in the place of the Amboy Company, as its assignee, and derives its title to the lands through the Amboy Company; and hence, when complainant earned the land, the title so acquired inured to the benefit of the Amboy Company, so as to make good its deed from the State, and complainant's title related back and took effect from the date of the original grant to the State.

To meet this position, counsel for the complainant contend that the Amboy, Lansing & Traverse Bay Railroad Company forfeited its rights to the land grant, and that the Legislature, in conferring the grant upon complainant, in effect declared the forfeiture by legislative action.

It is doubtless true that, where lands or franchises are held under legislative grants, reserving the right of forfeiture for non-performance of conditions subsequent, no judicial decree of forfeiture is necessary. Any public assertion, as was said in *Schulenberg v. Harriman, supra,* by legislative act, of ownership of the State after default of the grantee, such as an act reserving control of them, and appropriating them to particular uses, or granting them to others to carry out the original object, will be equally effective and operative.

Without stopping to decide what rights Maxwell had, if any, against the Amboy Company, had it completed the road and earned the whole lands granted, I am clear that he has no rights, as against the Jackson, Lansing & Saginaw Railroad Company, based upon the latter company's having completed the road and earned the lands. And, in the view I take of the case, it is not necessary to decide whether there.

was a forfeiture of the grant declared or acted upon by the Legislature or not. I am inclined to think that the Legislature did not intend to declare a forfeiture, but it did intend to grant and confer upon the Jackson, Lansing & Saginaw Railroad Company all the lands not actually earned by the Amboy, Lansing & Traverse Bay Railroad Company, subject to the act of June 3, 1856. Such is the language and effect of the act of the Legislature upon the subject. It recognized the compact entered into between the two companies, by which the Amboy Company conveyed to the Jackson Company "all its road, franchises, and lands and rights acquired under the act of Congress."

But, without the sanction of the Legislature, the conveyance, so far as it pertained to the land grant, was worthless. The Amboy Company had no rights in the lands not earned which it could convey to the Jackson, Lansing & Saginaw Railroad Company, any more than it could convey them to Maxwell. The important thing which the Amboy Company had, aside from the road constructed and its franchises, was the right to earn the land. This right was not transferable, and might be lost by forfeiture, or it might be voluntarily surrendered by the Amboy Company to the State. Since it could not be transferred, and was not forfeited, the effect of the assignment, by the permission of the Legislature, was a surrender of the right to the State, and the Legislature, acting under the authority conferred upon it by the act of Congress, vested this right in the complainant. Its title, therefore, to the lands as earned, is not derived from the assignment, but from the act of the Legislature conferring upon the Jackson, Lansing & Saginaw Railroad Company the lands granted by Congress, subject to the performance of the conditions of the grant. The title so acquired does relate back to the original grant, and takes effect at least from the date of its acceptance by the State, and, although patents issued under subsequent acts of Congress

65 MICH.—28.

and the Legislature may be convenient for the purpose of tracing title of record, and as evidence of having performed conditions, yet they are not necessary, and add nothing to the effect of the title conveyed by the grant. *Busch v. Donohue,* 31 Mich. 484.

The discussion has thus far proceeded upon the assumption claimed by complainant that the conveyances specified were authorized under the act of Congress, and were not in violation of its provisions; that the selections thus made were authorized by, and were not in contravention of, the act. The contrary view is presented by counsel for defendant, and insisted on as a complete defense to the action. It is stated by counsel substantially as follows:

The company had earned the right to sell 240 sections of land before 1865. It had not the right to sell *any* 240 sections which it might see fit to select, but 120 sections within any continuous 20 miles in length of its road. When it commenced its selection of lands at any particular point on its line, it must take 120 sections within a continuous length of 20 miles from that point, if unappropriated lands to that amount could be found within such 20 miles. Neither could the company go outside of the six-mile limits, if sufficient lands embraced within the grant were found therein. In this case the company had the right to dispose of 240 sections, and it is claimed it did so, and exhausted its rights before conveying to Maxwell. An examination of the deeds to Day and Emmons, and trust deed to Williams and Chapman, shows that the company covered land from town 6 to 21 north, and in ranges as far east as the land in question, and much further west.

It is claimed that it appears that the company went far beyond a continuous 20 miles and 40 miles in length of its road, and outside the six-mile limits, in these conveyances. The only theory upon which it could do this, and convey land which it had earned the right to dispose of, is that there

was no other land within the continuous 40 miles, or within the six-mile limits, at the several points, east and west, which was within the grant.

But the fact appears that the land in question was embraced in the grant, and about the center, north and south, of the lands conveyed by the deeds and mortgage; and it is claimed that the conveyances to Day and Emmons, and the trust deed or mortgage to Williams and Chapman, in so far as they conveyed land outside of the 40-mile limit, and at least to the extent that there was land not sold within that limit, were void, and the company had the right to make the conveyance to Maxwell and others of the land in question. I have already pointed out that the railroad company could convey no legal title to lands not earned.

It is too clear for dispute that the railroad company could not, upon completion of 20 continuous miles of road, select the 120 sections of land promiscuously from the lands granted along the whole line of its road. A contrary construction of the act of Congress would enable the company to select the most valuable lands along the line of its road, and, having secured and conveyed these, in case of default, only the poorer, and perhaps valueless, lands would be left to aid in the construction of the road, and these might not be a sufficient inducement to any other company to undertake the work. Congress granted the odd-numbered sections within the distance of six miles on each side of the line of the road. If no odd-numbered sections within the limits had been conveyed by the government, the grant would embrace 120 sections for every 20 miles in length of the line. The evident intent of the act was that the lands granted, and to which the right of selection pertained, should be coterminous with the road constructed. At all events, whether it should be coterminous or not, the selection of each 120 sections must be within a continuous length of 20 miles along the line of the road, and within 6 miles in width on each side of such

line, and must embrace all the land within such limits subject to the grant. If there is not sufficient within such limits to satisfy the terms of the grant, the act provides for the selection of other lands to make up the quantity. This manner of selection contemplated by the act of Congress is not a condition subsequent, but a limitation upon the grant, vesting in the company such, and only such, lands as are granted according to the intent and meaning of the statute; the effect of which limitation is to prohibit and render void any conveyance of lands by the State or company contrary to its terms.

Confessedly, the land in controversy is within the limits of the coterminous length from which selections were made by the company in the conveyances made by it and relied on by complainant. If the company had selected all the land included in the grant within 40 continuous miles of the road, it would have selected the lands in controversy here. When the company commenced the selection of lands upon any continuous 20 miles which it had earned the title to, all the land within the limit embraced in the grant under the act necessarily passed to the company, and became vested in it. The company, therefore, had the title and the right to convey the lands in controversy here to Maxwell, Campbell, and Van Etten, without any deed from the State; and I do not see how any fraud could be perpetrated upon the State in procuring a patent from it of the lands as charged in the bill. It follows that the title to these lands had passed to the Amboy, Lansing & Traverse Bay Railroad Company, and had by it been conveyed at the time the complainant acquired the rights to the land grant under the State legislation above referred to.

It follows, also, that Maxwell had a right to execute the mortgage in question.

But, aside from these considerations, it appears that Maxwell had an apparently legal title to the land in controversy,

and executed the mortgage to Davison to secure a *bona fide* indebtedness. The testimony does not show that Davison had any actual notice of the claim set up by complainant in its bill, or of any alleged defects in Maxwell's title. The record title appeared perfect in Maxwell. Under these circumstances, Davison cannot be affected by want of good faith between Maxwell and complainant in his dealings with it. Had complainant filed a notice of *lis pendens* with its bill of complaint against Maxwell, we might have been called upon to determine how far, if any, such notice would affect defendant; but no such notice appears to have been filed, and nothing appears in the testimony to impeach the good faith of Davison in taking the mortgage in question. He had a right to rely upon the record title under the circumstances, and, whether he knew what the record title disclosed or not, he has a right to interpose what the records disclose, in the absence of fraud or actual notice, as a protection to his mortgage interests, as against any alleged fraud or wrong-doing of his mortgagor in obtaining the legal title.

I do not say that there was any fraud upon the part of Maxwell. It is not necessary to pass upon that question, since it could not affect defendant's rights without connecting him in some way with it.

The decree of the circuit court should be reversed, and the bill of complaint dismissed, with costs of both courts.

The other Justices concurred.

A rehearing was ordered in this case, and a reargument had January 18, 1888, and the following opinions filed April 20, 1888:

CHAMPLIN, J. In this case an opinion was handed down at the April term, 1887, and is reported in 65 Mich. 416.

A motion for rehearing was made, and we ordered it to be reheard at the January term. We have been greatly assisted by a very full and able argument of the case.

While we adhere to the principles enunciated when the case

was first argued relative to the law which should govern in the selection of lands under the grant of Congress, we are agreed that the selection as made by the Amboy, Lansing & Traverse Bay Railroad Company must stand, and be regarded as valid, for the reason that no one is now in the position to dispute its validity. The United States, the grantor, raises no question, and probably will not, as the purpose of the grant has been accomplished, and the Jackson, Lansing & Saginaw Railroad Company makes no question about it, and, under the circumstances, would no doubt be estopped to dispute the legality of such selection at this time. The only question remaining is whether Davison's mortgage, under the facts and circumstances, is in equity a valid lien upon the lands mortgaged.

Briefly stated, the bill of complaint charges that the Amboy, Lansing & Traverse Bay Railroad Company only earned and became entitled to 240 sections of the granted lands; that it selected these, and disposed of them by the three conveyances particularly mentioned in our former opinion in this case; and that the lands in question here were not embraced in the selection and disposition so made.

That the Amboy, Lansing & Traverse Bay Railroad Company, without having earned the right to any further lands, and without any right to convey the same, did, by deed bearing date November 28, 1865, purport to convey to Maxwell, Campbell, and Van Etten the lands in dispute, with other lands, amounting to about 7,000 acres. This was before the Amboy Company had transferred its rights to the Jackson, Lansing & Saginaw Railroad Company by the agreement of October 6, 1866.

That, in order to strengthen the title alleged to have been vested in Maxwell, Campbell, and Van Etten by the aforesaid deed, Maxwell fraudulently and falsely gave out and pretended that the aforesaid lists, containing the selections made by the Amboy, Lansing & Traverse Bay Railroad Company,

had become lost from the files and custody of the proper State officers, and fraudulently procured another list to be filed in the office of the Commissioner of the State Land Office, containing some of the lands embraced in the original list, and also falsely inserting therein the 7,000 acres above mentioned, which had been conveyed to Maxwell, Campbell, and Van Etten, and procured a meeting to be held of the Board of Control on the second day of June, 1866, and by falsely representing the original lists to have been lost, and that these were correct copies of the same, obtained resolutions from the board that said selections were the same as those originally filed, and that for greater certainty, and for the protection of purchasers, the said lists then before the board be approved and confirmed by said board; that three copies of said resolutions were made and certified by the president and secretary of the board, to be filed as therein directed. Such was the posture of affairs relative to these lands when the agreement of October 6, 1866, mentioned in our former opinion, was entered into between the two railroad companies.

The bill further charges that Maxwell fraudulently obtained a patent for said lands, including the lands in question, from the State of Michigan to said Amboy, Lansing & Traverse Bay Railroad Company, which patent is dated May 28, 1867; and that both this deed from the State, and from the Amboy, Lansing & Traverse Bay Railroad Company to Maxwell, Campbell, and Van Etten, were unauthorized, null, and void; that the fraud was discovered by the Governor, who issued his proclamation, January 17, 1868, giving public notice of its invalidity, and the Board of Control, having ascertained that the original lists were not lost, and that they had been imposed upon, on the twenty-ninth day of January, 1869, rescinded the resolutions passed June 2, 1866. In the meantime Campbell and Van Etten had, by deed dated

August 5, 1868, conveyed the lands in controversy in this
suit to Maxwell.

On May 4, 1869, the complainant obtained a patent from
the United States of the lands in controversy as part of the
lands granted, earned, and selected by the Jackson, Lansing
& Saginaw Railroad Company under the grant in aid of the
construction of said railroad; and on November 6, 1869,
complainant filed its bill of complaint in the circuit court
for the county of Bay, in chancery, making the said Andrew
C. Maxwell, George H. Van Etten, Henry A. Ballentyne, and
A. B. Moore defendants therein, stating and charging the
facts above stated which up to that time had transpired, and
praying that the title of the said Maxwell, Campbell, and
Van Etten be declared void, canceled, set aside, and they de-
creed to surrender and quitclaim all rights and interests they
had in said lands to complainant.   Maxwell, Campbell, and
Van Etten answered, issue was joined, and proofs taken
therein, and a hearing was had, and decree entered in
favor of defendants, and complainant appealed to the Supreme
Court.

While the suit was pending, and before the execution of
the mortgage by Maxwell to defendant, negotiations were en-
tered into for a settlement of the controversy between the
complainant and Maxwell, Campbell, and Van Etten.   While
these negotiations were pending, Maxwell borrowed, at first,
$10,000 from defendant, and, to secure the payment thereof,
executed a mortgage dated the eleventh day of November,
1872, upon certain real estate, but not including therein any
of the lands in dispute in this suit.   Afterwards Maxwell
executed to defendant another mortgage, bearing date August
1, 1874, covering some of the same lands included in the
first mortgage, and other lands, and among them the lands
in dispute.   This mortgage was, upon the face of it, made to
secure the sum of $25,000.   This mortgage, the bill charges,

was executed and delivered by Maxwell while the negotiations for settlement were pending, for the purpose of wronging and defrauding complainant out of the benefits and advantages to be derived by the complainant from said agreement relative to the settlement of the suit and the conveyance of said lands; and it charges that the said Davison, at the time he received said mortgage from Maxwell, was informed and fully understood the terms and nature of said agreement, and fully understood the rights and interests of complainant in respect thereto; and charges that Davison neither advanced, nor loaned any money upon said mortgage to Maxwell until after the making of said deed to Maxwell, and the mortgage back, of date February 15, 1875.

The prayer of the bill is that the mortgage to defendant may be declared to be void as against the rights of the complainant, and that it may be canceled of record in the office of the register of deeds of Bay county, and that Davison may be required to discharge the same from said lands, and release them from the lien thereof.

The defendant answered, denying all knowledge of complainant's title or interest in the lands, and, on information and belief, avers the grant by Congress of the land to aid in constructing a railroad from Amboy to some point on or near Traverse bay, in the State of Michigan; the incorporation of the Amboy, Lansing & Traverse Bay Railroad Company; the act of the Legislature conferring the land, franchises, etc., upon this company, subject to the conditions imposed by the Legislature; and that such steps were afterwards taken and proceedings had under the several acts of Congress and of the Legislature that the title to the lands described in the bill of complaint became vested in the Amboy, Lansing & Traverse Bay Railroad Company. Avers the conveyances from the company to Maxwell, Campbell, and Van Etten, and to Maxwell, and that he thereby became the absolute sole owner thereof.

· That on November 11, 1872, he loaned Maxwell $10,000 ; and on August 1, 1874, Maxwell desired a further loan, and then and there agreed, if the defendant would make a further loan of the sum required, he would execute a mortgage upon certain lands which he (Maxwell) owned, including those described in the bill of complaint, to secure the sum of $10,000 theretofore loaned, and the sum which was to be loaned on that day; and thereupon defendant, on said first day of August, 1874, loaned Maxwell the further sum of $7,686.35, and Maxwell executed the mortgage to secure the payment of the several sums so as aforesaid loaned to Maxwell, which mortgage was recorded in the office of the register of deeds of Bay county on the tenth day of August, 1874, and embraced, among others, the lands described in the bill of complaint.

That when he made said loan, and took said mortgage, he was informed by said Maxwell that he was the owner of the property described in the mortgage, and that defendant would be amply secured; that he believed the title of said lands to be in Maxwell, and unincumbered, and he had no reason to doubt that said Maxwell held the absolute unincumbered title in fee simple to said lands; and that the additional loan of $7,686.35, on the first day of August, was made in reliance upon the security of said mortgage.

He denies any knowledge as to what steps complainant had taken in the matter of acquiring title to said lands, or what steps had been taken by it or any person to offset the title of said Maxwell.

Denies all fraud, and that he had any knowledge as to any fraud or artifice practiced by Maxwell, Campbell, Van Etten, or any State official, in and about procuring title to said land to be vested in said Amboy, Lansing & Traverse Bay Railroad Company, and the transfer by the railroad company to Maxwell, Campbell, and Van Etten, and, on information and belief, denies that the statements in said bill are true; and

says that he had no knowledge respecting the agreement which is set out in the bill of date September 1, 1874, nor of the negotiations or circumstances which led to the same; and denies that he had any knowledge or information upon the subject at the time he loaned said Maxwell the money, and took the mortgage as aforesaid.

Admits payment upon said mortgage of $2,535.31, and claims that the balance of both principal and interest is unpaid.

Denies all fraud and conspiracy charged; and avers that he is a mortgagee in good faith, for a valuable consideration, and that he loaned the money and accepted the mortgage, as hereinbefore stated, without any knowledge or information respecting, or having any reason to believe in the existence of, the claim made in the bill of complaint.

When the case was before us upon the former occasion, the decision was based, in the opinion of the writer, upon the illegality of the selections made by the Amboy Company, and the conveyances made by that company, in disregard of what I considered the intent of Congress in making the grant. The reargument has made it clear that I was laboring under a misapprehension upon the point that the lands in dispute came within the lands earned by the Amboy Company, if the selections had been made in accordance with principles suggested in the opinion.   I think that the result reached upon that branch of the opinion, namely, that the lands in dispute were a part of the 240 sections earned by the Amboy Company, and which they had a legal right to convey, was wrong. These lands, not being in the 40-mile limit, irrespective of the fact that the company had actually selected and disposed of the 240 sections earned by it, did not pass to the company, and were not at its disposal until earned in the manner provided by law.

I do not think that Campbell, Maxwell, and Van Etten obtained any title to these lands through the false lists sub-

stituted and imposed upon the Board of Control. The dates show that Maxwell, Campbell, and Van Etten obtained a deed from the Amboy Company, November 28, 1865. At this time it had earned no right to these lands, and there were no lists on file showing it had selected them. On the contrary, it had selected and conveyed all the land it had earned under lists, duly filed, which did not embrace these disputed lands. The false lists were not adopted and recognized by the Board of Control until June 2, 1866. The adoption or recognition of any lists, true or false, could not affect the rights of the railroad company. If it had earned the lands, it was entitled to them independently of any action the Board of Control might see fit to take; and, if it had not earned them, the board could not, by its act, confer the title upon it. This was decided in *Johnson v. Ballou.*

The fact that the land in dispute is not within the 40-mile limit, and had not been earned, would, upon the reasoning of the opinion before expressed in the case, render the deed from the Amboy, Lansing & Traverse Bay Railroad Company to Campbell, Maxwell, and Van Etten of no validity, and a fraud could be perpetrated upon the State in procuring a patent of the lands as charged in the bill (*Attorney General v. Smith*, 31 Mich. 359, 364); and I am satisfied, from the testimony, that the allegations in the bill in this respect were made out.

Whether Maxwell obtained such a colorable title as would protect an innocent purchaser or mortgagee from him for a valuable consideration I shall not undertake to decide. For the purposes of this case, treating it as such, upon a more careful and thorough review of Davison's own testimony, I have come to the conclusion that he does not occupy such position. He was introduced as witness on behalf of complainant, and we must therefore give credit to his testimony; but at the same time it is proper to presume that his testimony is as favorable to himself as the facts will warrant.

He testified that on the eleventh day of November, 1872,. he loaned Maxwell $10,000, for which he took his note of that date, payable in five years, secured by a mortgage upon real estate.  This mortgage covered over 600 acres of land, and some city property in Bay City, but did not cover the land in dispute.  He is not certain whether he let him have all the money at the date of the note and mortgage, or whether he let him have $5,000 in cash, and gave him his note for the balance, which he got discounted.  If he did so,. he afterwards paid it.

He further testified that afterwards, on August 1, 1874, Maxwell made a new note for $25,000, due in five years, with interest at 10 per cent. annually, and executed a new mortgage to secure the payment of the note; that this last-named note and mortgage were given and intended as a further security to the first loan of $10,000, and with the expectation that he would advance Maxwell $15,000 more.  This last. mortgage covers the Bay City property, and most of the land included in the first mortgage; also about 740 acres of other land, including the land in dispute.

He testified that he let Maxwell have, after he gave the note of August, 1874, $6,987, which he claims was secured by this additional mortgage; but, when asked to give the dates and amounts, it appears that none was furnished at its. date, and only $1,000 was furnished after the date of the mortgage, and that was October 14, 1874.  There is some confusion in reference to the date of a check for $1,500, bearing date August 21.  At the time it was introduced it did not appear to have any year upon it, and the witness was asked to look up the date and verify it.  He did so, and stated that the date was August 21, 1873.

In his answer he states that on the first day of August,. 1874, he loaned to said Maxwell the further sum of $7,686.35,. and that such additional loan was made in reliance upon the security of said mortgage.  He further testified as follows:

" I left this thing wholly to Maxwell. I didn't hunt this thing up at all at the time, and I would have let him have more, but some of my friends told me they understood I was lending him money, and that Maxwell was hard up,—I had better have the thing looked into; and so I had it looked up, and after I had the record examined I found these mortgages in ahead of mine. Then I quit letting him have money."

He had testified that he found a mortgage ahead of his, and, if Maxwell could have got that off, then he was to have paid him the balance to make, with the interest on the $10,000, up to $25,000; but he could not do it. He was asked:

" Q. Now, when you received the mortgage of 1874, in August, what knowledge did you have of the claims of the Jackson, Lansing & Saginaw Railroad Company upon any portion of the lands mentioned in that mortgage?"

To which he replied:

" A. Well, I think he told me there was some claim. I don't remember anything more particular. He might have told me that there was something to be paid on them. I think he told me there was some $600 or $700 to be paid,—something; I don't remember what,—but he said he would pay that."

In view of this admission by defendant, how is it possible for him to claim that he is an innocent mortgagee, without notice of complainant's claim, or of any fraud charged to have been committed on the part of his grantor in procuring his title to the lands in dispute? He is given notice by his mortgagor, in the course of the negotiation for the loan, that the Jackson, Lansing & Saginaw Railroad Company had some claim upon the land; that there was some $600 or $700 to be paid, but that he would pay it. This comes within the rule laid down by Mr. Sugden on Vendors (2 Sugd. Vend. Perkins' ed. 755),—

" That, to constitute a binding notice, it must be given by a person interested in the property, and in the course of the treaty for the purchase."

But this rule is not so restricted in many of the American courts, and notably by our own. In *Willcox v. Hill,* 11 Mich. 256, Mr. Justice CHRISTIANCY, speaking for the Court, said:

"It is *notice,* not *knowledge,* which is required, and it can only be required to be such as men usually act upon in the ordinary affairs of life; and whatever is sufficient to direct the attention of a purchaser to the prior rights or equities of third persons, and to enable him to ascertain their nature by inquiry, should be held sufficient."

Here was a person about to loan $15,000 to another, who proposed to secure him upon real estate. That person, in offering the security, tells the lender that there is a claim upon some of the property made by the Jackson, Lansing & Saginaw Railroad Company. Now, would not men, acting honestly and prudently, and as men usually act in the ordinary affairs of life, when so informed, inquire into the nature, as well as the extent, of such claim? To constitute a claim upon the land, it must have been a claim of lien or of title, either legal or equitable. It does not appear that he made any further inquiry of Maxwell, or any other person likely to know what the claim was. Further on he testifies:

"I loaned this money to Maxwell a good deal upon honor, on what he told me about it, and what others told me. Ed. Parks told me, I think, that Maxwell was well enough off to pay it; and I believed he was, and would do what was right and square. This money was loaned without me searching any record or anything at all up to the time that I speak of, about the time when my friends told me that he was hard up, that Maxwell was hard up,—and I was letting him have money, —I had better see to it what security I had. Then I went and investigated, and told him he couldn't have any more money."

In *Converse v. Blumrich,* 14 Mich. 120, this Court said:

"A person is chargeable with constructive notice where, having the means of knowledge, he does not use them. If he has knowledge of such facts as would lead any honest man, using ordinary caution, to make further inquiries, and does

not make, but, on the contrary, studiously avoids making, such obvious inquiries, he must be taken to have notice of those facts which, if he had used such ordinary diligence, he would readily have ascertained."

If, therefore, with the notice given him by Maxwell that complainant had a claim against the land he was about taking a mortgage upon, he had made further inquiries, as he was in conscience bound to do, what would he have ascertained, either by inquiring of Maxwell or of complainant? He would have ascertained that the complainant claimed the absolute and complete title to the land in question; that it had acquired such title under the grant of Congress, and had obtained a patent from the United States; that it had filed a bill of complaint against Maxwell and others to set aside his pretended title; that it claimed that his title was procured by fraud; and that the deed from the Amboy Company, in fact and in law, conveyed no title. He would have ascertained that the suit was then still pending, and that negotiations had been entered into for a settlement of the suit, but that it had not yet culminated into a written agreement or settlement. All these facts, I think, under the authority of the case last cited, defendant must be held to have notice of, which were then prominent between the parties respecting the title to these lands. If this is so, he stands in no better position than his grantor, Maxwell, occupied, and his mortgage interest must fall as infected with the same infirmity which has led me to declare Maxwell's title invalid.

No person will be justified, in a forum of conscience, when notified of a claim affecting the title to land in which he is about to acquire interests, in neglecting to make due inquiry, or in relying explicitly upon the honesty and integrity of his grantor to pay and discharge whatever claims there may exist of which he is notified. *Hosley v. Holmes,* 27 Mich. 416, 427; *Attorney General v. Smith,* 31 Id. 359.

The general rule as formulated by the best authorities, and supported by our own decisions, is that one having knowledge

of distinct facts affecting the title to land which he is about to purchase is not at liberty to close his eyes, and then screen himself under a plea of ignorance of other facts connected with those already known to him; but he is bound in good faith to make reasonable inquiry, and will be presumed to have done so, and will be affected with notice of all such facts as he might have learned by such inquiry. *Blaisdell v. Stevens,* 16 Vt. 179; *Williams v. Fullerton,* 20 Id. 346; *Bancroft v. Consen,* 13 Allen, 50, 51; *Blatchley v. Osborn,* 33 Conn. 226; *Cox v. Milner,* 23 Ill. 476; *Bacon v. O'Connor,* 25 Tex. 213; *Hume v. Franzen,* 73 Iowa, 25 (34 N. W. Rep. 490); *Stokes v. Riley,* 121 Ill. 166 (11 N. E. Rep. 877); *Doyle v. Teas,* 4 Scam. 202; *Rupert v. Mark,* 15 Ill. 540; *Ferguson v. Glassford,* 35 N. W. Rep. 820; *Storrs v. Wallace,* 61 Mich. 437; *Oliver v. Sanborn,* 60 Id. 346.

It is true that the defendant, after the above testimony was given, was asked this question:

"You say you had no information in any way of the claim of the railroad company against any of the lands in this mortgage of 1874?"

To which he replied:

"No, sir; not any at all."

And if we should ignore his previous testimony, and place implicit reliance upon this statement, as we did do in our former opinion, the fact of notice would not have been made out. Upon a re-examination of the case, we find that it was not in his testimony, but in his answer, that he said he had no information in any way of the claim of the railroad company. After testifying that he was informed that the company had a claim, and that Maxwell said he would pay it, he makes this denial of all information without any explanation, or attempted explanation, of his previous testimony; and I think it should be held binding upon him, under all the facts and circumstances disclosed by the record. He seems to have been peculiarly oblivious as to dates. When asked if he

knew of any negotiations pending between Mr. Maxwell and O. M. Barnes, of Lansing, relative to a settlement of the litigation, in August, 1874, he says:

"Well, I don't, as far back as that. He said that Barnes had made him an offer. He wanted some $600 or $700 to sign over some lands. He was going to pay that, so it would be all clear, and he could sell it. But I couldn't say what year it was in,—whether it was before this suit was commenced. I think, though, it was before this suit was commenced."

His solicitor, Mr. Draper, then said:

"He is directing your attention now to August, 1874.

"A. I don't know anything at all about it. I didn't know anything at all about any litigation going on.

"Q. Had you received any information about it,—anybody tell you anything about it?

"A. No, sir; unless it is since. I knew nothing about it at that time."

So that it appears by his testimony that he neither knew nor had information of the litigation that was going on in August, 1874, but that he was informed that the complainant had a claim upon the lands about to be included in the mortgage to him.

I am of the opinion that the decree appealed from is right, and should be affirmed.

SHERWOOD, C. J., and LONG, J., concurred with CHAMPLIN, J.

CAMPBELL, J. I regret that circumstances have prevented me from being able to discuss this case fully, but I will state very summarily some reasons which induce me to adhere to the former conclusion of this Court. Reaching that conclusion, there was no necessity for referring to what I then thought, and think now, is a fatal defect in the record. Mr. Maxwell is interested in the equity of redemption of the property covered by this mortgage, if not directly,—as perhaps the foreclosure of his mortgage to complainant may stand in the way of that,—yet substantially, inasmuch as the

decrease of the mortgaged estate must render his personal liability more likely to be resorted to for such deficiency. He will be personally and directly affected by any decree which we make, and no complete decree can be made without him. For this reason the bill should be dismissed.

I concurred in the former opinion, which held Mr. Davison a *bona fide* mortgagee of a legal title, and, inasmuch as we ordered a rehearing, I am bound to say that I do not concur in any part of the opinion which controverts the legal efficacy of the title. I do not think the question of estoppel against complainant can be any different from what it would otherwise be, by reason of the source of title. Whatever may have been the purpose of Congress in the land grants, I think there is no doubt that so long as the grant was not resumed by the United States, and was extended, we are not concerned now with any action not dependent on the laws of Michigan. I think that complainant got no rights which were not qualified by the action of its assignor, the old Amboy, Lansing & Traverse Bay Railroad Company; and, while I took no part in the decision of *Johnson v. Ballou*, I have always supposed it settled the validity of the grant now in controversy, and can see no reason why it should not do so.

This is not a proceeding to set aside the patent issued by the State to the Amboy Company, and I do not see how it can be collaterally attacked in this way. Whatever may be the preliminary conditions required before making a grant, they are not jurisdictional facts which can be inquired into except in a direct proceeding to avoid the patent. When the proper State authorities gave the certificate on which the patent was issued, the law presumes that the facts existed, and were brought to their attention before they decided. Those facts could not be presumed open to general knowledge. It was their business to investigate them before acting, and they do not differ from any other facts required to exist, under the land laws, as essential to land grants. When the proper

officers issue a certificate on matters within their jurisdiction, it may of course be true that they have been defrauded, but that does not make their action null, or allow it to be attacked collaterally. Since the case of *Fletcher v. Peck*, 6 Cranch, 87, no one has supposed that a state can revoke its own grants without legal proceedings, and Governor Crapo's attempt to do this bound no one.

Furthermore, this is the second suit in which the present complainant has sought relief which was and could be predicated only on the assumption that the Maxwell title was good on its face. If not, it certainly could be no cloud on its title. When Mr. Davison found Maxwell vested with the full legal title under a patent which had never been attacked directly, and concerning which he had no notice of any attack at all, I do not think he was bound to look further without some information which made it his duty to do so.

The bill in a general way charges that he knew all about the negotiations then pending between complainant and Maxwell. But there is not a particle of testimony to any such knowledge, or any other knowledge, when the mortgage was taken. The brief of complainant's counsel does not rely on any such notice, and the application for a rehearing does not claim that Davison was not a *bona fide* mortgagee, if the title was good at law. As our former decision was put largely on his holding in good faith, I do not think that point is in the case, and I see no reason to doubt his good faith.

The amount of the mortgage is not now in controversy. If less than its face was advanced, then it will take so much less money to redeem it. But this is not a bill to redeem, and that question is not before us.

I can see no reason for disturbing our former decision.

MORSE, J., concurred with CAMPBELL, J.